UNITED STATES, Appellee,

v.

Lawrence P. ROCKWOOD, II, Captain,
U.S. Army, Appellant.

No. 98–0488.
Crim.App. No. 9500872.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 26, 1999.

Decided Sept. 30, 1999.

COX, C.J., delivered the opinion of the Court, in which CRAWFORD, GIERKE, and EFFRON, JJ., joined. GIERKE, J., filed a concurring opinion. SULLIVAN, J., filed an opinion concurring in part and in the result.

For Appellant: *Ramsey Clark* (argued); *Lawrence W. Schilling* and *Colonel John T. Phelps, II* (on brief).

For Appellee: *Captain Arthur J. Coulter* (argued); *Colonel Russell S. Estey, Lieutenant Colonel Eugene R. Milhizer,* and *Major Patricia A. Ham* (on brief).

Amicus Curiae: *James J. Gibson* and *Billy B. Ruhling, II* (Law Students) (argued); *Frederic Lederer* (Supervising Attorney), *Ian R. Iverson, Patrick J. McGuire,* and *Paul D. Ziegler* (Law Students) (on brief)—For the William and Mary School of Law.

Chief Judge COX delivered the opinion of the Court.

The charges in the instant case arose on September 30 and October 1, 1994, in Haiti, during the initial days of the American-led, multinational operation designated as Operation Uphold Democracy. The granted issues concern appellant's contentions that he was denied a fair trial due to command influence and conflict of interest "affecting virtually the entire command"; that the military judge improperly denied production of several defense-requested witnesses; that all of the court members were disqualified; that the evidence of appellant's guilt was insufficient to sustain the convictions; and that the military judge's instructions regarding the defenses of justification, necessity, and duress were erroneous.[1]

The Court of Criminal Appeals summarized the circumstances leading to the charges in this case as follows:

On 31 July 1994, the United Nations (U.N.) Security Council determined that the situation in Haiti was a threat to the peace and security of the region. Acting under Chapter VII of the Charter of the United Nations, the Security Council authorized U.N. Member States to form a multinational task force (MNF) "to use all necessary means to facilitate the departure from Haiti of the military leadership, ... the prompt return of the legitimately elected President [President Aristide] and the restoration of the legitimate authorities of the Government of Haiti, and to establish and maintain a secure and stable environment...." United Nations Security Council Resolution 940, U.N. SCOR, 3413 mtg. (1994) [hereinafter U.N.S.C. Res. 940].

On 19 September 1994, with a MNF invasion of Haiti imminent, a team led by former President Carter negotiated an agreement with the ruling military government in Haiti which permitted the peaceful entry into Haiti of a MNF to accomplish the aims of U.N.S.C. Res. 940. Elements of the 10th Mountain Division immediately began deploying into Haiti on 19 September 1994 as part of Joint Task Force (JTF) 190. The Haitian military government was to remain in place until the agreed return of President Aristide's government on 15 October 1994.

Appellant was a counter intelligence officer with the 10th Mountain Division's Office of the Assistant Chief of Staff for Intelligence (G2). He deployed to Haiti on 23 September 1994. Appellant was personally concerned about intelligence reports which reflected deplorable conditions at the National Penitentiary in Port au Prince. He attempted to initiate a JTF inspection of the National Penitentiary by

---

1. As framed by appellant, the granted issues are:

I

WHETHER CAPTAIN ROCKWOOD WAS DENIED A FAIR AND IMPARTIAL TRIAL AS A RESULT OF INTERRELATED UNLAWFUL COMMAND INFLUENCE AND CONFLICTS OF INTEREST AFFECTING VIRTUALLY THE ENTIRE COMMAND, INCLUDING THE COURT AND PANEL MEMBERS AND PROSECUTION WITNESSES.

II

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY DENYING PRODUCTION OF MAJOR GENERAL MEADE, BRIGADIER GENERAL HILL, OTHER WITNESS TESTIMONY AND EVIDENCE RELEVANT AND NECESSARY TO ESTABLISH CAPTAIN ROCKWOOD'S DEFENSES.

III

WHETHER INDIVIDUAL MEMBERS OF THE MILITARY COURT WHO WERE DISQUALIFIED FROM SERVICE ON THE COURT WERE ERRONEOUSLY PERMITTED TO SERVE DESPITE BEING CHALLENGED FOR CAUSE.

IV

WHETHER THE EVIDENCE WAS LEGALLY INSUFFICIENT TO ESTABLISH BEYOND A REASONABLE DOUBT THAT CAPTAIN ROCKWOOD WAS GUILTY OF CHARGES I, II, AND III.

V

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO INSTRUCT THE PANEL ON THE DEFENSES OF JUSTIFICATION AND NECESSITY AND BY GIVING A DURESS INSTRUCTION THAT WAS INCORRECT AND CONFUSING.

The appeal was heard on February 26, 1999, at the College of William and Mary School of Law, Williamsburg, Virginia, as a part of the Court's "Project Outreach" program. See 34 MJ 194, 195 n. 1 (CMA 1992). Under the supervision of Professor Fredric Lederer and with the consent of appellant, law student amici filed a brief in the case and orally argued several issues.

raising the issue with his superiors on the joint intelligence staff, a captain in the staff judge advocate's office, and the division chaplain. Appellant considered the JTF's inaction toward the National Penitentiary to be contrary to President Clinton's intent[i] and a violation of the JTF's obligation under international law to protect human rights.

On 29 September 1994, a grenade attack near the Haitian Presidential Palace killed several Aristide supporters and injured many others. As a result of this attack, Major General (MG) Meade (the 10th *Mountain Division commander* and the general court-martial convening authority who referred these charges to trial) increased operational and counter intelligence efforts to identify the attackers and to safeguard American forces.

Appellant disagreed with the decision to increase operational security instead of immediately inspecting the National Penitentiary. On the morning of 30 September 1994, he filed a formal complaint with the 10th Mountain Division Inspector General (IG) requesting that the IG "[i]nform the commanding general as soon as possible of facts that may lend the appearance that the JTF is indifferent to probable ongoing human rights violation[s] in PAP [Port au Prince, or National] Penitentiary." Appellant's complaint explained his concerns: "Per the intent of the U.N. resolution and the primary 'cause ad bellum' [that] our President addressed to the Nation for our [ ] military presence, indifference to ongoing human rights violation[s] in our direct proximity appears to me to be a subversion of that intent."

Later that day, appellant decided, without command authorization, to "inspect" the National Penitentiary. Appellant did not go to his appointed place of duty when his shift began that evening because he had gone to the prison without authority. Later, after appellant's return from the prison, Lieutenant Colonel (LTC) Bragg[ii] ordered appellant admitted to the local combat support hospital for psychiatric evaluation.[iii] Appellant left the hospital without permission, contrary to an order

from the psychiatrist evaluating him, to tell LTC Bragg what he saw at the prison. During this discussion, appellant repeatedly and disrespectfully yelled at LTC Bragg and disobeyed orders to be "at ease" and to "be quiet."

\*     \*     \*

[i] Appellant watched President Clinton's televised address to the nation on 15 September 1994. He recalled the President stating that one of the reasons for U.S. involvement in Haiti was "to stop the brutal atrocities" that were occurring in Haiti. Appellant did not recall seeing a televised news conference on 19 September 1994, at which President Clinton said, "My first *concern, and the most important one, obviously,* is for the safety and security of our troops. General Shalikashvili and Lieutenant General Hugh Shelton, our commander in Haiti, have made it clear to all involved that the protection of American lives is our first order of business."

[ii] Lieutenant Colonel Bragg served as the Assistant Chief of Staff for Intelligence (G2) for the 10th Mountain Division, the Director of Intelligence for JTF 190, and the Assistant Chief of Staff for Intelligence (J2) for the multinational forces. Appellant worked for LTC Bragg.

[iii] Appellant's actions caused LTC Bragg to have concerns about appellant's mental health. Prior to going to the prison, appellant, a Tibetan Buddhist, left a note on his bunk quoting Buddhist sacred text about making "a gift of my body." The note continued, "I have done what *is legal to stop something that is plainly illegal.* No[w] you coward[s] can court-martial my dead body." Appellant's note concluded that the "action required" was "[a]ll means necessary to implement the intent of the UN and U.S. President[']s intent on Human Rights. Take this flag, it is soiled with unnecessary blood." Appellant fastened a U.S. flag patch (normally worn on the battle dress uniform to identify U.S. forces) in an upside down position to his note with a safety pin. He subsequently "inspected" the National Penitentiary with a loaded M–16 rifle. The Haitian prison officials summoned the military attaché from the U.S. Embassy for assistance in disarming appellant. The attaché ultimately persuaded appellant to unload his weapon and leave the prison.

48 MJ 501, 503–04 (1998).

In view of appellant's conduct, as well as the fast-evolving situation on the ground and the initial evaluation of appellant at the combat support hospital (including appellant's revelation to the psychiatrist that he had been taking Prozac, an anti-depressant, which had been prescribed by a civilian doctor, without the knowledge of military au-

thorities), the decision was made to evacuate appellant from Haiti immediately.

For his conduct in Haiti, appellant was offered nonjudicial punishment under Article 15, Uniform Code of Military Justice, 10 USC § 815, along with the opportunity to resign, which he refused. Subsequently, court-martial charges were preferred and referred to a general court-martial.

Appellant was charged with a series of offenses under the UCMJ arising out of his conduct on the evening of September 30 and during the following day, October 1. The charges of which he was convicted included: (1) failing to go to his prescribed place of duty at the Joint Task Force headquarters at the time he was required to report for duty, 2000 hours on September 30, in violation of Article 86, UCMJ, 10 USC § 886; (2) engaging in conduct unbecoming an officer on September 30, in violation of Article 133, UCMJ, 10 USC § 933, by leaving the headquarters area in a manner that intentionally avoided detection, jumping over the fence surrounding the headquarters, traveling to and demanding entry at the National Penitentiary to make an inspection that he was not authorized to conduct, thereby endangering himself, the classified information he possessed as a counterintelligence officer, and ·a fellow military officer who came to the Penitentiary in light of appellant's activities; (3) unlawfully departing the combat support hospital, which had become his appointed place of duty on October 1 pending evacuation from the country, in violation of Article 86; (4) disrespect towards his superior commissioned officer, LTC Bragg, in violation of Article 89, UCMJ, 10 USC § 889; and (5) willful disobedience of repeated commands from LTC Bragg to lower his voice, "be at ease," and "stop talking," in violation of Article 90, UCMJ, 10 USC § 890.

The court-martial, comprised of officer members, found appellant not guilty of two specifications under Article 92, UCMJ, 10 USC § 892, for failure to obey certain orders and dereliction of duty, and found him not guilty of portions of the charge under Article 133 involving certain of his actions at the National Penitentiary. The court-martial sentenced appellant to a dismissal and total forfeitures.

The convening authority disapproved the entire finding of guilty of conduct unbecoming an officer. Accordingly, he dismissed that Charge and its specification. In all other respects, however, he approved the findings. Regarding the sentence, the convening authority reduced the forfeitures to $ 1,500 pay per month for 2 months, but he approved the dismissal. The Court of Criminal Appeals affirmed the approved findings and sentence. 48 MJ at 513.

Particular facts relevant to each issue are incorporated within the discussion of the issue itself.

I

■ In the first issue, appellant alleges unlawful command influence and conflict of interest affecting the convening authority, most of the command structure, the court-martial and its panel members, and the prosecution witnesses. The allegations are an extension of those made in appellant's motion *in limine* at trial to disqualify the convening authority and dismiss the charges. As at trial, appellant points to no specific evidence of disqualifying influences or interests. Rather, the essence of his argument is that, because he made accusations against the command and intentionally violated its orders, and because he has continued to criticize the conduct of Operation Uphold Democracy through various media and human rights organizations, the entire command was put in the position of defending its own conduct at the court-martial. Accordingly, in appellant's view, nobody in this command could have anything to do with the processing of his case or the judging of his conduct because the "[c]ommand would lose face" unless appellant was convicted. Thus, appellant contends that the convening authority and court members were "judging themselves when they judged" appellant. Final Brief at 29. We reject this thesis.

■ Article 37, UCMJ, 10 USC § 837, prohibits a convening authority or anyone

else from unlawfully influencing the action of a court-martial. Further, a convening authority is disqualified if he is an "accuser" or has "an interest other than an official interest in the prosecution of the accused." Art. 1(9), UCMJ, 10 USC § 801(9); RCM 504(c)(1), Manual for Courts–Martial, United States (1994 ed.). Bare allegations of unlawful command influence "in the air," however, are not sufficient to raise the issue. *United States v. Allen*, 33 MJ 209, 212 (CMA 1991), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992). Nothing in the instant case suggests that the convening authority here had anything other than an official interest in the case or that he in any way sought improperly to influence the outcome of this court-martial.

Military judges are disqualified if their "impartiality might reasonably be questioned," if they have "personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts," or if they have acted in the case in various other disqualifying capacities. RCM 902(a) and (b)(1). Nothing in the instant case suggests that the military judge here was disqualified.

Court members are subjected to examination by the parties, challenge for cause, and peremptory challenge. RCM 912(d), (f), & (g); *United States v. Modesto*, 43 MJ 315, 318 (1995). For the reasons indicated in Section III, *infra*, we are satisfied that the court members here were free from command influence, bias, conflict of interest, or other disqualifying features.

Witnesses are subjected to the "crucible of cross-examination" to test their assertions for accuracy, bias, conflict of interest, or other reasons to discount or disbelieve their testimony. *United States v. LeMere*, 22 MJ 61, 69 (CMA 1986). The defense fully exercised its prerogatives in this area and vindicated this important principle. Thus, if any of the witnesses were biased, that bias was exposed through cross-examination.

On this record, appellant has not demonstrated that the convening authority of the 10th Mountain Division, or anyone within the organization that acted in appellant's case, should have been disqualified from proceeding or acting on appellant's case. Appellant's personal conviction that the convening authority must have felt humiliated or threatened by appellant's criticism is not sufficient to demonstrate that appellant's trial was infected by unlawful command influence or conflict of interest.

Public criticism of military operations— including withering critiques of strategy, tactics, personnel policies, and human rights concerns—is inherent in a democracy. Congress, through the enactment of Article 138, UCMJ, 10 USC § 938, and the laws governing the Inspector General function, 5 USC App. 3, has established specific means of directing criticism within the armed forces. Given the significant domestic and international consequences of military operations, there will be few military leaders or organizations who escape such criticisms. If a servicemember were permitted to disqualify convening authorities, panel members, and witnesses simply by leveling or reciting critiques of military operations, it is unlikely that any command could conduct a court-martial involving offenses pertaining to military activities. We do not believe that Congress, in recognizing the critical role of military justice in maintaining good order and discipline, intended to preclude commanders from utilizing that system in an operational setting. The traditional tools of discovery, voir dire, challenges, and cross-examination provide a means of identifying improper influences or interests on the part of commanders, court-members, or witnesses. In the present case, appellant has not demonstrated that any such influences affected the fundamental fairness of his court-martial.

## II

The second issue involves appellant's *in limine* motion to produce as witnesses Major General (MG) Meade, the initial commander of the joint task force (and the convening authority in appellant's case), and Brigadier General (BG) Hill.

Regarding MG Meade, civilian defense counsel explained that the defense want[ed] to talk to General Meade about his understanding of what the U.N. resolution required, what President Clinton's instruction required as to command intent, what international law imposed upon him as a general officer to do in connection with human rights. How any order that sought to prohibit protection of human rights can be harmonized with international law and U.S. law, and what if anything he did at any time to protect human rights during the period.

In a written proffer designated as "expected testimony," the defense added that MG Meade

> will further testify about what, if any, emphasis he placed on dealing with reports of human rights violations when issuing the mission statement and commander's intent related to operations in Haiti, particularly in what way he responded to the Commander–in–Chief's directives concerning human rights issues. He will also testify as to whether he declared that force protection was a higher priority than "stopping brutal atrocities in Haiti."

It is not represented that the defense had ever spoken to or tried to speak to MG Meade, or that they knew what he might say about these matters.

Based on the proffers, the military judge could not discern *in limine* the relevance of MG Meade's "expected" testimony, though he acknowledged that "[i]t's possible that his involvement with these matters is relevant, but I can't say that based on what I know now." Accordingly, the military judge denied the motion to order production of the convening authority as a witness *at that time*, but he specifically invited the defense to make the request again after the Government's case was presented or at any appropriate time during the defense case. At the same time, the judge instructed the Government to know the whereabouts of the convening authority during the course of the trial so that he could be brought back quickly, if necessary. Appellant does not claim that the defense ever renewed its request for MG Meade, nor have we come across such a request in our review.

BG Hill, also requested as a witness by the defense, was sought for his alleged knowledge of the improved prison conditions in Haiti in January 1995, months after appellant's evacuation from Haiti. BG Hill was assistant division commander of the 25th Infantry Division, which succeeded the 10th Mountain Division as the command element of the task force. The military judge declined to order production of BG Hill on the grounds that his knowledge was "absolutely too remote, and so it's not relevant."

The Uniform Code of Military Justice grants all parties "equal opportunity to obtain witnesses ... in accordance with such regulations as the President may prescribe." Art. 46, UCMJ, 10 USC § 846. The President, in turn, has provided that "[e]ach party is entitled to the production of any witness whose testimony on a matter in issue ... would be relevant and necessary." RCM 703(b)(1); *see* Mil.R.Evid. 401. We review judges' decisions on witness production for abuse of discretion. *United States v. Miller*, 47 MJ 352, 359 (1997); *United States v. Ruth*, 46 MJ 1, 3 (1997).

As to BG Hill, we are satisfied the military judge did not abuse his discretion in determining that BG Hill's proposed testimony was not relevant and denying his production as a witness.

In hindsight, it appears that the request for MG Meade was meant to be connected with subsequent defense trial assertions that: (1) atrocities *were being committed* at the National Penitentiary on and immediately preceding September 30, 1994; and (2) by September 30, the American-led force could readily have spared the assets to prevent these atrocities; but (3) as a result of incompetence, culpable indifference, or worse, the American command was unconcerned about Haitian–on–Haitian human rights violations.

Even in retrospect, MG Meade's state of mind regarding his personal understanding of international law and the balance he sought to strike between force protection and suppressing violence have little to do with whether the conditions on the ground justified appellant's conduct under interna-

tional law. Whatever marginal relevance MG Meade's state of mind might have had, we cannot fault the military judge for lacking clairvoyance *in limine*. Moreover, the requirement of RCM 703(c)(2)(B)(i) for a synopsis of expected testimony is not satisfied by merely listing subjects to be addressed; rather, it must set out what the witness is expected to say about those subjects. We hold that the military judge did not abuse his discretion in refusing to order the convening authority's production at that time. Moreover, in failing to renew and clarify its request for MG Meade, as they were specifically invited to do, the defense failed to preserve the issue.

### III

The next issue pertains to appellant's challenge for cause of the members who sat in his case. Of the twelve members detailed to the court-martial, the military judge excused one member without objection, he dismissed five members based on defense challenges for cause, and an additional member was excused as a result of the defense's peremptory challenge. The defense also challenged the remaining five members for cause, but the military judge denied those challenges. The issue before us pertains to the correctness of the military judge's decision not to strike the remaining five members.

The issue was fully and satisfactorily treated by the Court of Criminal Appeals, 48 MJ at 510–12, and we have only a few observations to add to that discussion. Essentially, the trial judge permitted extensive and broad voir dire of the prospective members, consuming well over 500 pages of record of trial. All of the members were challenged on a wide range of bases, including their various degrees of contact with prospective witnesses and other court members, their knowledge of conditions on the ground in Haiti as a result of having been there, and their exposure to pretrial publicity.

The defense also challenged many members for having inflexible attitudes on sen-

tencing. During voir dire, the military judge had permitted civilian defense counsel the latitude of questioning the prospective members about the sentences they were likely to adjudge.

For example, counsel was allowed to ask each of the members the following sort of question: Assume you find appellant guilty of all the charged offenses (i.e., that he, without justification or excuse on the 11th and 12th day after the multinational force's landing in Haiti,[2] was twice absent without leave from his appointed place of duty, that he disobeyed several orders, that he was disrespectful to a superior commissioned officer, that he was derelict in his duty, and that his conduct was unbecoming that of an officer), is there nevertheless a place in the Army for appellant?

Many of the members expressed reservations, upon which counsel argued that they held inelastic attitudes on sentencing. In *United States v. Reynolds*, 23 MJ 292, 294 (CMA 1987), we stated that "[n]either the Government nor the accused is entitled to a commitment from the triers of fact about what [sentence they would ultimately impose]." *See also United States v. Small*, 21 MJ 218, 219 (CMA 1986). Moreover, in *United States v. Ohrt*, 28 MJ 301 (CMA 1989), and *United States v. Horner*, 22 MJ 294 (CMA 1986), we saw through the commonly employed euphemisms for punitive discharge.

█ There is no issue before us, however, concerning the propriety of the defense questions, as the military judge permitted the inquiry. We are satisfied in any event that, viewing the voir dire of each prospective member as a whole, the military judge was well within his discretion in accepting those that he did. *United States v. Dinatale*, 44 MJ 325, 327 (1996).

█ The parties are "entitled to members who will keep an open mind and decide the case based on evidence presented in court and the law as announced by the mili-

---

**2.** Appellant arrived in Haiti several days after the initial wave, on September 23. He began work on September 24 and "inspected" the penitentia-

ry on September 30. He had previously managed just one trip into town.

tary judge." *Reynolds,* 23 MJ at 294. Members are not *per se* disqualified from serving if they have "[d]istaste for particular offenses," *United States v. Daulton,* 45 MJ 212, 217 (1996), "innocuous prior knowledge of the facts of a case," *United States v. Lake,* 36 MJ 317, 324 (CMA 1993), or a "professional relationship" with government witnesses, *United States v. Rome,* 47 MJ 467, 469 (1998). None of the information extracted from court members who sat in appellant's case disqualified them automatically. Furthermore, it is quite clear that the military judge was basing his rulings on his personal assessment of each member. Thus, in dismissing one member, MAJ H, over trial counsel's protestations, the military judge responded:

> Major [H] is excused. While there might be some validity to some of the points that you've [trial counsel] raised, judging his demeanor about the inelastic attitude toward dismissal, he did not convince me that he did not have an inelastic attitude. In other words, I think his statements about dismissal I could not necessarily believe. . . .

In contrast, accurately characterizing the gist of MAJ R's voir dire responses (one of the members not struck), the military judge ruled:

> At the beginning of his questioning, he [MAJ R] said he could follow the judge's instruction; he could consider zero to maximum. And you have to take a look at whatever the evidence was. At the end he said if the accused was found guilty of all of these offenses, he probably should be removed from the Army. It would be difficult for him to conjure up in his imagination the facts that would allow him to keep the accused in the Army. But he certainly said it was within the possibility of happening. What we want here are people who can consider the evidence, and then decide an appropriate punishment. Obviously if the accused stands convicted of all these offenses, it probably would be very difficult for some of these court members to not vote for a dismissal. But the bottom line is he said that he would not imply any automatic punishment. And I

don't think we can ask for anything more from this particular court member. He said he could consider it. The weight to be given to it is a different matter. He can consider it. He wouldn't automatically vote for a dismissal, and the challenge is denied.

Recently, in *United States v. Giles,* 48 MJ 60, 61 (1998), we concluded that a military judge abused his discretion when he declined to grant a challenge for cause of a member who persistently indicated that he was "necessarily set on a bad-conduct discharge," even though he agreed to consider all the evidence. Where, however, the totality of the circumstances indicate, as here, that a member is genuinely open to considering all mitigating and extenuating factors which are relevant to a just sentence *before* arriving at a fixed conclusion, a military judge has broad discretion to grant or deny challenges. *United States v. White,* 36 MJ 284, 287 (CMA 1993), *cert. denied,* 510 U.S. 1090, 114 S.Ct. 918, 127 L.Ed.2d 212 (1994). Giving the military judge the deference due him on account of his superior position to observe the demeanor of the court members, we agree that he did not abuse his discretion in declining to strike the remaining members.

## IV

▆▆▆ In the fourth issue, appellant challenges the sufficiency of evidence of the offenses of which he stands convicted. Being a court without fact–finding authority, Art. 67(c), UCMJ, 10 USC § 867(c) (1994), our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

▆▆▆ There is no question but that the Government's evidence met the standard of legal sufficiency. Appellant himself, through his testimony, established that, rather than going to his appointed place of duty, he went "over a perimeter wall, an area that would attract the least attention." He then pro-

ceeded downtown to the National Penitentiary, where he was ultimately placed under control by a fellow Army officer who was the embassy attaché. Numerous other witnesses testified to appellant's absence from his place of duty that night, the discovery that he was at the penitentiary, and his recovery therefrom. In addition, numerous witnesses testified to the boundaries imposed on him as a patient at the field hospital, his transgression of those boundaries, his accosting LTC Bragg, and his disobedience of and disrespect to LTC Bragg. The evidence of the offenses of which appellant stands convicted is legally sufficient.

### V

The final issue involves the defense theses of "justification," "duress," and "necessity." As to justification, the defense argued at trial that the military had failed in its duty to protect human rights under the norms of international law by failing to secure the National Penitentiary. Appellant himself tended to portray the U.S. forces in general, and the multinational force command and staff in particular, as a "renegade division," that was "indifferent" to human rights or life, and "criminally negligent" because it failed to inspect immediately and rectify the conditions at the National Penitentiary of Haiti.

In contrast, appellant viewed his own course of conduct as justified or excused under general international law, the Hague and Geneva Conventions, the United Nations and Nuremberg Charters, and the President's "intent" as announced in a televised speech. Appellant testified that he alone was following these dictates, and that he believed it was necessary to enter the prison because he believed that the prisoners faced torture, murder, and other human rights violations. Thus, the defense wanted instructions to the effect that appellant should be exonerated if the foregoing matters were established.

It is important to place these matters in context. The United Nations Security Coun-

cil authorized a multinational force to "facilitate the departure from Haiti of the military leadership" and the "prompt return of the legitimately elected" government. Pursuant to that authorization, and utilizing the threat of imminent military invasion, representatives of the United States reached an agreement with the de facto government of Haiti in which *the de facto military government was to remain in place* until a time well after the point at which appellant took matters into his own hands.

Indeed, as of September 30, according to the embassy attaché who recovered appellant from the penitentiary, the de facto government was still in "control of the security apparatus," and the multinational force was obliged to continue working with the "outlaws" for a few more weeks. Appellant himself acknowledged that "cooperation" with the de facto regime was required. He knew that the "troika" comprising the de facto government was still in country, that "we were trying to get them to leave the country with as minimal force as possible," and that it was "the national policy" to work with them for the time being.[3]

The difference between a military organization and a mob is the role of command and control in channeling, directing, and restraining human behavior. A modern army is made up of soldiers possessing a variety of skills, and it operates corporately. Some soldiers carry rifles, others use artillery, others drive tanks, and others fly helicopters. There are mechanics, engineers, radio and computer operators, medics, military police, cooks, clerks, ordinance and supply personnel, truck drivers, and many other types of specialists. The only way the mission can be performed is if all elements perform their functions in accordance with the guidance and restrictions imposed by the command. Communication of intelligence up and down the chain of command and between elements is vital. The overall missions and objectives are established by the civilian governmental

---

**3.** One member of the troika outranked MG Meade, the multinational force commander. Therefore, as appellant volunteered: General Shelton "was being kept in the area because we did not—we wanted to show respect to Lieutenant General Cedras, and didn't want to make him lower himself to address [Major] General Meade who was one rank lower."

supervisory structure and are implemented down the chain of command.

The harsh reality of command responsibility is that military leaders constantly face difficult choices in meeting the competing demands of operational goals and force protection, while at the same time addressing a host of related issues concerning the environment, innocent civilians, and collateral damage resulting from the use of force. It is the commander, not the subordinate, who must assess these competing concerns and develop command priorities. Given the destructive weaponry that our nation entrusts to our military leaders, there is no other way to control and direct the awesome power that is vested in the armed forces.

The decision to place primary emphasis on force protection at the outset of the operation is the type of decision that is within the responsibility of the commander. Every officer and enlisted person under that command has a duty to perform in support of the commander's priorities, and is guided in that duty by orders that both direct and restrict that servicemember's scope of action. Whether in the chaos of large-scale combat or in the delicate conduct of peacekeeping and peace enforcement, a servicemember must obey a commander's decision as to the priority given to force protection, as opposed to protection of the civilian population.

The undisputed record demonstrates that appellant's role in the mission at the time was force protection, and that he knew it. He was a company grade staff officer assigned to the counterintelligence section at the multinational force headquarters.[4] His job was to analyze information regarding threats to the joint task force and to pass it up through command channels, where operations were planned and directed. Neither appellant nor anyone within his section was involved in intelligence collection, and they had no operational authority whatever. Other elements of the multinational force were involved in spreading out across Haiti projecting power, suppressing Haitian–on–Haitian violence, and facilitating the governmental transfer. As always, force protection was a critical component of the overall operation.[5]

The record demonstrates, moreover, that at the time of the charged offenses, the situation on the ground was dynamic. To appellant's knowledge, there had already been a firefight on September 24 at a location removed from Port–au–Prince, and there was credible evidence of threats against the multinational force by various groups and individuals.[6] These hostile groups and individuals apparently believed that American public and political support for the operation was thin, and that the infliction of even a small number of casualties on U.S. forces might provoke enough dissonance at home to

4. Though appellant had approximately 15 years of military experience at the time of his court-martial, in April and May 1995, much of his time had been spent as an enlisted medic and health counselor. Haiti was his first "large operation" deployment.

5. One of appellant's subordinate noncommissioned officers, Sergeant First Class David L. Hooper, made this point when, explaining how appellant was becoming obsessed with matters outside his function, he testified:

As a matter of fact, what—after the second day of reviewing or publishing the reports that Captain Rockwood had done—done the final edit on, I realized he was becoming emotionally involved. His focus was now more and more on, you know, that Multinational Forces were not doing their job, which is not our assessment. That's not our job to publish in our intel summary that we're not doing our job. I noticed more and more of this—we've got to do more for humanitarian

rights. I understood what he was saying, but again, that particular publication is not the venue for that particular information. So what I did was I sat down one day and I said, sir, I know you're a very strong and emotional, professional officer, you know, and I'm your NCOIC, and you know, I support your right to feel what you feel, to think what you think, but I go, sir, *we've got to recall what our actions are and what our actions can affect out there as part of the total operation.* Maybe you need to think about, you know, if necessary I'll help you, you know, re-review and we'll get reoriented to a more—a more clearly intelligence product rather than an inflammatory product. (Emphasis added.)

6. Appellant regarded these "threats to U.S. forces ... [as] insignificant [compared] to the threats that faced the Haitian population that we were there to protect." Shortly after appellant's evacuation from Haiti, an American soldier was shot and critically injured, and still later another American servicemember was shot and killed.

cause the operation to be aborted.[7] These threats included potential grenade, mortar, and machine gun attacks on Americans, and they were taken very seriously by the task force command.[8] In this connection, identifying weapons caches was also a critical part of the counterintelligence mission.

Further, the counterintelligence function supported the mission of safely restoring the legitimate Haitian government. The hand grenade tossed into the crowd commemorating the ouster of President Aristide and celebrating his imminent return—in close proximity to American forces on the day before appellant's excursion—underscored the need to detect and stop the bad actors. Larger rallies were expected the next day—the day appellant commenced the charged conduct—as appellant himself acknowledged.

He also acknowledged that, as a result of the grenade attack, the operational tempo "more than picked up. I think it changed the focus of the entire operation." When asked if the operational tempo was "fast paced and hectic" at the time, he replied, "That's obvious."

At the same time, the American-led force was in the midst of trying to contain and dissipate a class-based civil war. Various thug elements loyal to the de facto government roamed the streets at night seeking out their victims, and oppressed slum-dwellers swarmed the upper class neighborhoods, the police, and shops by day.[9]

As might be expected in a multinational operation sanctioned by the United Nations, the American-led force was not some kind of government unto itself, with power to arrogate whatever role it wanted. Indeed, regarding prisons, according to the embassy attaché,

the overall prison issue was an issue that was put before the whole inter-agency process in the U.S. Government. The primary responsibility fell to USAID [U.S. Agency for International Development] and the Department of Justice to help the Haitians move ahead in terms of improving prison conditions.

In addition, the attaché explained, a group of international police monitors was established as part of the multinational force "to work with the interim public security force— the Haitian security forces—to monitor their—their activities and help stand up an interim police force." The security forces were the ones who were guarding the prisoners.[10]

As it happens, the commander of the multinational force's military police contingent in the Port–au–Prince area, Colonel (COL) Michael L. Sullivan, also visited the National Penitentiary on October 1, 1994, at

---

7. Appellant's testimony indicates that he was well aware of this concern:

   [M]atter of fact, as I was leaving the hanger at Griffiss Air Force Base to go on the 747 to go to Port–au–Prince, there was a very heated argument between, I think the leader of the Senate and the leader of the minority about whether or not Haitians—Haitian democracy was worth one American life. So I was aware that there was—this was a very highly charged political issue in the United States, whether or not democracy was worth one American life.

8. The record reflects that appellant was not with the 10th Mountain Division in Somalia the year before, when a deceptively friendly initial reception quickly turned hostile and deadly.

9. At trial, appellant repeatedly criticized what he characterized as the command's excessive emphasis on force protection and its indifference to Haitian suffering. When asked on cross-examination if the command was being "indifferent" to Haitian violence "when it tried to prevent vio- lence during the demonstrations on the 29th and 30th [of September]," appellant retorted:

   You mean along the approaches to Petionville? The massive use of deadly force against pro-Aristide demonstrations, that they approached the residences of the elite in Petionville? Is this what you're addressing?

10. Appellant did know that, "under doctrine," the Civil Military Affairs Center was "required to monitor the Haitian government infrastructure and that would include the prisons that were under the control of the Haitian military po- lice...." He was not aware that other agencies and institutions beyond the military had roles in assisting in justice and prison matters. Ultimate- ly, it appears, the armed forces component of the multinational force did a great deal of the heavy lifting in cleaning up the prisons. That does not mean, however, that the military command had the authority to take over functions of the de facto government on whatever timetable and to whatever degree it chose.

about 9:00 a.m., 8 to 10 hours after appellant was removed from the facility. Testifying as a defense witness, COL Sullivan stated that he had not heard about appellant's visit at the time; he was there on business of his own. As the multinational forces had begun taking prisoners, COL Sullivan was looking for appropriate places to house them.

Arriving without notice, he was received cordially and was, upon his request, immediately given a complete tour of the facility. He described the building as

a large structure that was in total disrepair. Paint—what the areas that could be called painted as in many of the other places on Port–au–Prince, there was little evidence of any care of the building, little evidence of any care of the structure. It was filthy. Conditions inside the prison were terrible.

\* \* \*

If you're comparing it with something in the United States, you really can't. If you're comparing it with other third [world] countries, it was probably at the low end. If you're comparing it with other facilities in Port–au–Prince, it's probably below average, but not by much.

COL Sullivan compared the prisoners with "the people outside the prison," noting that they "didn't look much different.... The whole country is poor," he observed, adding that, "[t]he whole country is in horrible condition, which is why we went in the first place." This latter observation was echoed by many other witnesses.[11]

As he toured the facility, COL Sullivan saw "no signs of physical torture or abuse," albeit "there were a group of men in the infirmary that looked very ill." Had he "seen conditions ... that were immediately life-threatening," the Colonel testified, he "would have taken action, as we had done on the streets

of Port–au–Prince." He did not, however, see immediate, life-threatening conditions.

COL Sullivan queried the prison officials about their budget and learned that "[t]here was no money, no resources put into those government—government facilities," which was consistent with what he "experience[d] in the police stations." As a result of his visit to the prison, COL Sullivan submitted that very day a report to the joint task force commander, MG Meade, recommending that "the United Nations or some—some relief organization be directed to visit the prison and provide some relief for the conditions." COL Sullivan decided not to house his prisoners there.

Appellant's description of the penitentiary is qualitatively similar to COL Sullivan's. Like COL Sullivan, appellant was received "courteous[ly]." Appellant, however, arrived in the early evening, about 7:00–7:30 p.m., when it was already starting to get dark. He was not able to tour the entire prison, and only saw a fraction of the prisoners. He described several crowded cells of what he deduced to be "military prisoners" because "they appeared in very good shape.... [T]hey seemed almost to have athletic physiques." Those in the "infirmary," however, "seemed very emaciated, very skeletal," and there were "a number of amputees."

Appellant was surprised that "[i]t seemed very open at night for a prison. They seemed to keep the door open." Three or four women, who appellant guessed were maids, "came in and out of the prison." "They were washing clothes. There's a fountain there," appellant testified. As appellant stood in the darkened courtyard of the prison for "about 3 hours," he saw no one in the prison towers, and he "could not see how this facility could keep anyone in if they got out of a cell, because there were steps going up

11. One witness described "the human misery everywhere in Haiti.... One young boy having to urinate on his hands to clean them" because "there was no running water." According to another witness: "The conditions in Haiti were horrendous. I mean, they were absolutely horrendous. The kids, malnutrition, they were bad. I mean, they were—I have never seen anything

that bad in my life. The were extremely bad. I mean, I remember vividly kids, parents, people eating out of a garbage dump, digging through garbage. A particular stream that ran—I went by—you know, they were urinating in that, bathing in it. I remember that vividly. That will always stay with me."

the walls. . . ." [12]  Like COL Sullivan, appellant reported no torture or physical abuse, and none of the prisoners complained to him.

Before analyzing the legal doctrines pertaining to appellant's conduct, it is necessary to review what the record reflects he actually knew of the current situation in the National Penitentiary.

Appellant testified that, while still at Fort Drum, as plans were being made for the operation, he concluded that "simple common sense would tell you that a prison would be the—the key location to be concerned about [for Haitian–on–Haitian violence] on entry and a change of government on entry of a foreign force into a country."  In Haiti, "a common sense, logical conclusion" nourished his belief that people were "going to die" at the National Penitentiary.  In his trial testimony, he cited repeatedly, but never quantified, "open source and other reports" on "Haitian–on–Haitian violence in the prisons." He also repeatedly invoked "history." [13]  He maintained that he "was aware that . . . [the National Penitentiary] has one of the worst conditions in the world," that he had "foundational knowledge that there was [sic] human rights violations," and that he "had no, not one bit of information that it was anything otherwise."  He conceded, however, that he "had no spot—counterintelligence spot reports on the Haitian Penitentiary."

On the evening of 27–28 September, a report about a jail in Les Cayes (a city some distance from Port–au–Prince) was widely circulated following its discovery by U.S. military personnel inspecting a co-located police station for weapons.  The condition of that facility and its prisoners was reportedly "horrendous" and "shocking."  Appellant projected that, "*if* those same conditions exist in Port–au–Prince," the multinational force "could be liable under international law. . . ." (Emphasis added.)

On the 29th of September, appellant received a classified report on prisons in Haiti, one that he had requested while still at Fort Drum in late August.  Essentially, the report lists the number of people known or believed to be incarcerated at various facilities around the country on various specified dates.  In addition, a narrative section provides very general and historical background information pertaining to the overall system.  Appellant's take on the report was that, although it was a "general report," it "corroborated the *information* ... [he] received from ... [his] counterintelligence sources," and it gave him "every reason to expect the conditions of Les Cayes in Port–au–Prince."  No other evidence of the conditions at the National Penitentiary, or appellant's foreknowledge of them, was adduced at trial.

One observation is essential at this point. Whatever information, of whatever reliability, appellant may have had about the inner-workings of the Haitian prison and politico-justice systems over the last 45 years, up to and including the oppressive reign immediately preceding the U.N.-authorized intervention, he could not point to any information about the *current* conditions, operations, or practices at the penitentiary.

Yet at trial, appellant maintained that the charged conduct concerning his visit to the prison was based on the rules of engagement in effect during the operation in Haiti.  In particular, he cited rule 7, which states, in pertinent part:

PERSONS *OBSERVED* COMMITTING SERIOUS CRIMINAL ACTS WILL BE DETAINED USING MINIMAL FORCE NECESSARY. . . .

When appellant slipped over the wall of the multinational force compound in the late afternoon of September 30, 1994, it is clear

12.  Indeed there was evidence that about 2 weeks later, on October 13, 117 people escaped from the National Penitentiary, and that was not an isolated incident.

13.  At one point, he stated, "[A]s [a] student of history I've never heard of an oppressive or dictatorial regime that doesn't have political prison-

ers.  I don't know if one has existed in history. If Haiti was that condition [sic], it would be the first in history, I think."  At another point, he stated, "And I had history from the the last 45 years.  I know it doesn't have 'Secret' on top and the bottom, but, believe it or not, some things are valid without that caveat."

that he had observed or been apprised of no criminal acts at the National Penitentiary.[14]

### Justification

Under the formulation of the Manual for Courts–Martial, "justification" is denominated a defense for a "death, injury, or other act caused or done in the proper performance of a legal duty." RCM 916(c); *cf.* 1 Wayne R. LaFave and Austin W. Scott, Jr., SUBSTANTIVE CRIMINAL LAW 641–43 (1986).[15]

■ Appellant cites us to no legal authority—international or domestic, military or civil—that suggests he had a "duty" to abandon his post in counterintelligence and strike out on his own to "inspect" the penitentiary. Neither does he suggest any provision of any treaty, charter, or resolution as authority for the proposition. Further, he does not here claim that he received personal orders via television from the Commander–in–Chief. Moreover, he cites no authority for the proposition that his observations at the penitentiary supplied him with a duty that permitted him to be disrespectful to LTC Bragg, to disobey his orders to be at ease, or to depart from the field hospital where he was being detained. In this circumstance, we conclude that the military judge did not err in declining to provide a justification instruction.

### Duress and Necessity

Duress and necessity are very closely related defenses. 1 LaFave and Scott, *supra* at 631; Rollin M. Perkins and Ronald N. Boyce, CRIMINAL LAW 1065 (3d ed.1982). Classically, duress was seen as a defense to crime if the defendant was compelled or coerced to commit the crime by some human agency, under a threat of serious imminent harm to the defendant or others. Thus: As-

sist in this bank robbery or I will kill you (or another person). Being charged with bank robbery, the defendant interposes duress as a defense. *See* LaFave and Scott, *supra* at 614–27; Perkins and Boyce, *supra* at 1059–65; *see also United States v. Vasquez,* 48 MJ 426, 429–30 (1998).

■ For the defense of duress to apply, the crime committed must have been of lesser magnitude than the harm threatened, and "the duress must [have] consist[ed] of threatening conduct which produce[d] in the defendant (1) a *reasonable* fear of (2) *immediate (or imminent)* (3) death or serious bodily harm." LaFave and Scott, *supra* at 615, 618 (emphasis added, footnote omitted). An "obviously safe avenue of escape before committing the prohibited act" nullifies the defense. Perkins and Boyce, *supra* at 1060.

■ The defense of necessity, in contrast, was traditionally seen as a "choice of evils" defense. Here the "pressure of circumstances" [16] was not brought by human agency, but by the situation itself. LaFave and Scott, *supra* at 629. Thus: It was necessary for me to trespass across the private property in order to rescue the person who was drowning in the adjacent lake. Charged with trespass, the defendant pleads necessity. *Id.* at 627–31. The defendant's belief that his actions were necessary must have been reasonable, and there must have been no alternative that would have caused lesser harm. *Id.* at 635, 638; *United States v. Bailey,* 444 U.S. 394, 410, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Put another way, "the issue is whether the duress or necessity was such that a reasonable person, under like circumstances, would have been impelled to do what was done by the defendant." Perkins and Boyce, *supra* at 1069.

---

**14.** Or at any of the other four facilities in the Port–au–Prince area he wanted inspected.

**15.** "Justification" was not traditionally a separate defense in Anglo–American jurisprudence, but rather denoted a category or class of defenses that included "necessity," "self-defense," and "public duty." *See* Art. 3, ALI MODEL PENAL CODE, *reprinted in* ALI MODEL PENAL CODE AND COMMENTARIES (Part I) 1–5 (1985); Chapter 5, 1 Wayne R. LaFave and Austin W. Scott, Jr., SUBSTANTIVE

CRIMINAL LAW (1986). Where the defense of "duress" applies, the actor is not considered justified for the conduct, but excused. Rollin M. Perkins and Ronald N. Boyce, CRIMINAL LAW 1059 (3d ed. 1982). *See also United States v. Bailey,* 444 U.S. 394, 409–10, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980).

**16.** Perkins and Boyce, *supra* at 1065, call necessity: "NECESSITY (DURESS OF CIRCUMSTANCES)."

As LaFave and Scott note, however, "modern cases have tended to blur the distinction between duress and necessity." *Id.* at 628, quoting *United States v. Bailey, supra.*

The Manual formulates a defense of "coercion or duress" as follows:

> It is a defense to any offense except killing an innocent person that the accused's participation in the offense was caused *by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury if the accused did not commit the act. . . .* If the accused has any reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened, this defense shall not apply.

RCM 916(h)(emphasis added).

There is no Manual provision specifically denominated "necessity," nor is there a standard military instruction under that heading. According to one commentator, necessity has never been directly recognized in the military, possibly owning to a concern that "private moral codes will be substituted for legislative determinations, resulting in a necessity exception that swallows the rule of law." [17]

Be that as it may, the military judge decided to provide what was functionally a necessity instruction. The judge recognized that the standard duress instruction did not fit the circumstances, in that there was no coercion by human agency in the classic sense. That is, no one put a gun to appellant's head and said, "Inspect the prisons or somebody dies." So the judge tried to "blend" the duress instruction to fit the circumstances, including the elements of necessity.

Thus, he instructed the members:

> Now I'd like to talk to you about what we're going to call "duress." It's a defense. And the evidence has raised the issue of duress in relation to all of the charges that have been charged against Captain Rockwood.

> Duress is a complete defense to each offense to which it applies, which is all of them. In evaluating this defense, keep in mind that you must apply the defense to each offense separately. To be a defense, Captain Rockwood's participation in the offense must have been caused by *a well-grounded apprehension that a prisoner in, or prisoners in, the National Penitentiary would immediately die or would immediately suffer serious bodily harm* if Captain Rockwood did not commit the charged act.

> *The amount of compulsion, coercion or force must have been sufficient to have caused an officer who was faced with the same situation and who was of normal strength and courage, to act. The fear which caused Captain Rockwood to commit the offense must have been fear of death or serious bodily injury* and not simply fear of injury to reputation or property, or to bodily injury less severe than serious bodily harm. The threat and resulting fear must have continued throughout the commission of the offense.

(Emphasis added.) Specifically absent from this instruction was any limitation that the coercion or reasonable apprehension be caused by human agency.

■ At trial, appellant objected to the officer "of normal strength and courage" phrase. On appeal, he contends he was entitled to a duress instruction *sans* this language. We agree with the military judge that classic duress was not raised, and thus this point is moot. Even if duress were raised, the complained-of language merely expresses an objective standard, which is unquestionably a component of both duress and necessity. LaFave and Scott, *supra* at 618–19, 635; Perkins and Boyce, *supra* at 1061, 1069; RCM 916(h).

---

17. Eugene R. Milhizer, *Necessity and the Military Justice System: A Proposed Special Defense*, 121 Mil.L.Rev. 95, 96-97 (1988). To the extent Milhizer is referring to situations not involving the flouting of military authority, he surely goes too far. There is, for example, no reason why the drowning situation would not provide a defense.

However, "It was necessary for me to leave my post or disobey your lawful order in order to perform some more important function" could be another matter, one which the instant facts do not require us to resolve., *See United States v. Olinger*, 50 MJ 365, 366–67 (1999).

■ Regarding necessity, appellant contends that the military judge erred by failing to give such an instruction. In our view, a necessity instruction was in fact given, and the military judge formulated the instruction in a manner that comported well with general civilian criminal law. The inclusion of elements of objectivity and compulsion of circumstance in the instruction was not a flaw. *See* LaFave and Scott, *supra* at 629, 635, 638; Perkins and Boyce, *supra* at 1069; *Bailey, supra* at 410.

There may indeed be unusual situations in which an assigned military duty is so mundane, and the threat of death or grievous bodily harm to civilians is so clearly defined and immediate, that consideration might be given to a duress or necessity defense. However, in view of the form of the instruction here incorporating the concept of necessity, that question is moot.

\*　　\*　　\*

When the American military police colonel with nearly 30 years of service stands in the bowels of the Haitian National Penitentiary and pronounces it "filthy ... terrible," we have no occasion to disbelieve him. Indeed, we assume that prison conditions in much of the world would be shocking to our sensibilities. This was not, however, a general inquest into Haitian prison conditions; nor was it a broad-based investigation into the overall conduct of Operation Uphold Democracy. As to those matters, we make no attempt to pass judgment.

Rather, this was an inquiry into appellant's conduct, and in the course of it, questions were raised as to whether his actions were justified or excused under the circumstances then prevailing. Appellant was assigned important intelligence responsibilities, and the record supports the conclusion that he did not possess information demonstrating a clearly defined and immediate threat of death or grievous bodily harm to innocent civilians. Under the circumstances, the court members' rejection of appellant's defenses was rational. *Cf. Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560

(1979); *United States v. Turner,* 25 MJ 324 (CMA 1987).

The decision of the United States Army Court of Criminal Appeals is affirmed.

GIERKE, Judge (concurring):

I agree completely with the majority opinion. I write separately to set out in greater detail my reasons for upholding the military judge's ruling on the challenge of MAJ R.

In my view, the military judge should not have allowed the defense to ask questions on voir dire that asked for a sentencing commitment from court members based solely on the nature of the offenses. *See United States v. McLaren,* 38 MJ 112, 118 (CMA 1993) (recognizing that responses to "artful" questions and inaccurate responses do not require that a challenge for cause be granted). Thus, it is not surprising that the court members' responses required clarification.

This Court has long recognized that "[a]n unfavorable inclination toward an offense is not automatically disqualifying." *United States v. Giles,* 48 MJ 60, 63 (1998), quoting *United States v. Bannwarth,* 36 MJ 265, 268 (CMA 1993), and citing *United States v. Reynolds,* 23 MJ 292, 294 (CMA 1987), and *United States v. Cosgrove,* 1 MJ 199 (CMA 1975). "[T]he test is whether the member's attitude is of such a nature that he will not yield to the evidence presented and the judge's instructions." *McLaren, supra,* quoting *United States v. McGowan,* 7 MJ 205, 206 (CMA 1979).

In this case, the defense voir dire included the following:

Q. Shall we start again?

A. [MAJ R] Well, your question is, if he was found guilty on all charges should he stay in the Army?

Q. Yeah—I mean, you read these five specifications, or whatever they are called—pretty lengthy stuff—now, knowing that and he is convicted of them, do you want somebody in the Army like that? Do you think there is a place in the Army for people who do those things?

A. Well, if he is found guilty, I would say no.

Q. So, in your opinion he shouldn't be in the Army?

A. If he is guilty—if he is found guilty.

Q. And then, if he—you'd consider everything, but basically, your opinion, if he is convicted, he ought to be removed from the Army?

A. That's correct.

The military judge recognized what the defense was doing. He first explained that the court-martial was "not an administrative elimination board." He explained that "a dismissal for an officer is like a dishonorable discharge for an enlisted person," and that "it's a very severe punishment, you could never erase the effects of it." He discovered upon questioning MAJ R that he did not understand that the adjudication of guilt was separate from the determination of a sentence. The military judge then asked the following clarifying questions:

Q. Well—but, there is guilty or not guilty, and then there is mitigating and extenuating circumstances. What I'm saying is, is that based upon the mere fact that he is guilty, you would feel compelled to vote for a dismissal, regardless of any of the other evidence?

A. Well, no, I guess I need—when you said that there is mitigating or other—I guess, I would need to hear that first, that would come out in the trial.

Q. So, you could envision that there might be some mitigating or extenuating circumstances that wouldn't warrant a dismissal—a punitive separation?

A. Can I envision any? No, but I might hear some.

Q. All right. Could you consider everything from zero punishment to the maximum, whatever that is?

A. Yes, sir, I've done that before when I've given Article 15's and other nonjudicial—but, I guess, if you're asking at face value, without hearing any of the other things—could I weigh it between the two? I would weigh it.

Q. But it would be hard for you to envision any extenuating or mitigating circumstances so extreme as to allow you to keep the accused in the service?

A. That's correct.

Trial counsel then asked the following questions:

Q. Major [R], if we could just touch on this issue just a little bit more, with respect to any punishment, do you feel that there is any automatic punishment that you must give to the accused, if you found him guilty of anything?

A. No.

Q. Do you believe that you would be able to consider evidence in the sentencing phase of the trial, that would allow you to determine whether or not a dismissal was appropriate? For example, do you believe there might be evidence, although you might not be able to imagine in your mind right now—

A. Okay, I understand what you're—yeah, I think that if I heard something that I'm not aware of right now, that, yes, I could take that into consideration.

Q. You just can't think of anything because you don't know the facts of the case?

A. At the—that's correct.

Q. Okay. So, if you heard it—you would wait to determine whether or not to assess a dismissal or any other type of punishment?

A. That's correct.

Q. Until you've heard the evidence?

A. [Affirmative response]

Q. So, do I understand you to say, you don't feel compelled to do that?

A. No, I wouldn't be compelled to do that.

Q. Just because of the charges?

A. That's correct.

We recognize that a military judge has a "superior position in evaluating the demeanor of court members." Thus, we grant a military judge "great deference" and we "will not reverse a ruling on a challenge for cause absent a clear abuse of discretion." *United States v. McLaren, supra.* I agree with the majority that the military judge did not abuse his discretion.

Finally, I agree with the majority that this case is distinguishable from our recent decision in *United States v. Giles, supra.* In

*Giles,* the court member in question was adamant. He agreed to listen to the evidence before deciding on a sentence, but said that he was "necessarily set on a bad-conduct discharge." 48 MJ at 61. In this case, once the military judge cleared up the confusion, the member unqualifiedly stated that he would reserve judgment on whether to vote for a dismissal until he heard all the evidence.

SULLIVAN, Judge (concurring in part and in the result):

I concur in the result on parts I and II of the majority opinion. In my view, Major General Meade should have been produced for the limited purpose of establishing whether he referred charges against Captain Rockwood for personal rather than official reasons. *See generally* Art. 46, Uniform Code of Military Justice, 10 USC § 846, and RCM 703(b)(1), Manual for Courts–Martial, United States (1994 ed.). Nevertheless, I would not reverse appellant's conviction.

Before Captain Rockwood went to the prison in Haiti, he lodged an official Inspector General's (IG) complaint against numerous members of Major General Meade's staff for not protecting political prisoners. Once Major General Meade's command was charged by Captain Rockwood with misconduct (a highly unusual event), a reasonable person might conclude that the General may have had a personal interest in punishing Captain Rockwood, *i.e.,* retaliation for embarrassing his command. Since Rockwood had been charged for misconduct after he had filed the IG complaint, Rockwood should have been able to at least question Major General Meade about any personal motives on his part in referring these criminal charges to court-martial. *See* Arts. 1(9) and 22(b), UCMJ, 10 USC §§ 801(9) and 822(b). As Justice Frankfurter said in *Caritativo v. California,* 357 U.S. 549, 558, 78 S.Ct. 1263, 2 L.Ed.2d 1531 (1958):

> Audi alteram partem—hear the other side!—a demand made insistently through the centuries, is now a command, spoken with the voice of the Due Process Clause of the Fourteenth Amendment, ... whenever any individual, however lowly and unfortunate, asserts a legal claim.

However, notwithstanding the error made by the trial judge in not ordering a possible accuser under Article 22(a) to be questioned about his motives in referring charges against Captain Rockwood, I would hold this error harmless. *See United States v. Jeter,* 35 MJ 442, 446–47 (CMA 1992) (holding defect in referral by accuser not jurisdictional). In my view, *any* reasonable Division commander, given the actions of appellant as reported to Major General Meade, would have brought these charges against him. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (if probable cause existed to stop a person for a traffic violation, actual motivation of officer for stop is irrelevant).

Accordingly, I join the majority in affirming this case.