# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
WOLFE, SALUSSOLIA, and ALDYKIEWICZ
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Major JASON A. SCOTT**
**United States Army, Appellant**

ARMY 20170242

Headquarters, I Corps
Sean F. Mangan, Military Judge
Colonel Steven C. Henricks, Staff Judge Advocate

For Appellant: Lieutenant Colonel Christopher D. Carrier, JA; James D. Culp, Esquire (on brief).

For Appellee: Lieutenant Colonel Eric K. Stafford, JA; Major Wayne H. Williams, JA; Captain Sandra L. Ahinga, JA (on brief).

30 October 2018

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Senior Judge:

In early 2015, Sergeant First Class (SFC) AM deployed to Afghanistan where he served as part of an isolated special warfare unit. Back at Joint Base Lewis-McChord (JBLM), Washington, Major (MAJ) Jason A. Scott, appellant, began a romantic and sexual relationship with SFC AM's wife. Given a direct order to stop the relationship, MAJ Scott disobeyed the order. He was then charged with adultery and disobedience in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934 (2016) [UCMJ]. He pleaded guilty to both charges, and the military judge sentenced appellant to a dismissal, restriction for thirty days, and forfeiture of $3,000 pay per month for three months.[1]

---

[1] Pursuant to the pre-trial agreement, the convening authority approved the sentence as adjudged.

Now on appeal, MAJ Scott assigns two errors. Major Scott claims his sentence is too severe given his over twenty years of good service. Based on the record introduced at trial, it is not too severe, and we find appellant's dismissal to be an appropriate sentence. Major Scott also claims his defense counsel, Captain (CPT) JH and CPT MD, provided grossly ineffective assistance in preparing and conducting his sentencing case. Major Scott's second claim has some merit. Perhaps unusually, the best evidence of counsels' deficient performance is contained in the affidavits submitted by the government.

In the end, we are unable to fully resolve the claim of ineffective assistance on appeal without more information, and therefore remand the case for a fact-finding hearing pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

## BACKGROUND

Major Scott is an Apache helicopter pilot. Including enlisted time, he has well over twenty years of active service, to include combat deployments. Major Scott met Mrs. HM in May of 2015 when she was teaching a spin class on JBLM. Soon after, they began a dating relationship. Major Scott began introducing Mrs. HM as his girlfriend to co-workers in his office and to his supervisor, Colonel (COL) Harvey.

Mrs. HM is married to SFC AM. Sergeant First Class AM was assigned to the 19th Special Forces Group. As MAJ Scott was dating Mrs. HM, SFC AM was deployed to a remote part of Afghanistan.[2]

In October 2015, MAJ Scott's leadership discovered he was dating a married woman. Major Scott's supervisor, COL Harvey, counseled him and gave him an order to cease all contact with the sergeant's wife. Major Scott acknowledged and signed the order.

Major Scott willfully violated the order and continued to have sexual intercourse with Mrs. AM in his on-post quarters. The couple also vacationed together on a trip to New York.

Their relationship was not exactly blissful and began to fray as SFC AM's deployment was nearing an end. As the relationship wound down, MAJ Scott began sending Mrs. HM a series of harassing text messages. In these messages, MAJ Scott

---

[2] The parties stipulated MAJ Scott did not know Mrs. HM was married until after they had been dating for several months.

referred to SFC AM by his first name and in disparaging tones. He would send numerous messages to Mrs. HM, in turn threatening her, and then professing love for her. After being told by her in cold terms to move on, MAJ Scott told Mrs. HM that she will become a "whore", that "no man wants a whore for a wife", and she will regret not being with him.

On 5 January 2015, MAJ Scott sent Mrs. HM a text-message link to a news story about a Special Forces soldier who had been killed in Afghanistan and other soldiers who were "trapped." Using SFC AM's first name, the message contained a single question, "Is [SFC AM] dead?" Mrs. HM responded that she did not know. Later, she told appellant that her husband was trapped and surrounded, that members of the unit had been killed, and that she would not receive any additional news for the next seventy-two hours.

Major Scott then suggested that she might get lucky if SFC AM were to be killed in action. She responded with a two-word explicative. Major Scott then told her that if SFC AM survived, he would have appellant's "leftovers" followed by, "But I doubt he will touch you after he knows what you have been doing." The parties stipulated that the relationship ended on 25 January 2016. On 15 February 2016, in the last text message included as part of the record, MAJ Scott told Mrs. HM the following:

> Now that [SFC AM] is home I see you are playing the innocent wife. Don't make me out to be the bad guy. You are the one that lied. And I'm not going to let you get away with it.

In a lengthy written unsworn statement submitted to the court-martial, SFC AM explained the effect that appellant's misconduct had on him. He discussed the firefight in which two soldiers were killed, and in which MAJ Scott had joked about him being killed. He talked about how when he deployed, he left his wife "in the care of my brothers" who "wear the same U.S. Army over the left breast pocket of their uniforms." He described a fundamental reshaping of how he viewed and trusted Army officers.

3

## LAW AND DISCUSSION

### A. Sentence Appropriateness

Appellant contends that a sentence of dismissal is inappropriately severe. It is not.[3] Appellant was convicted of two offenses. Neither crime is minor. Each offense individually, on these aggravating facts, could warrant a dismissal.

As a corollary to extraordinary authority vested in commissioned officers by the UCMJ,[4] a dismissal is an authorized punishment for *every* violation of the UCMJ. *See* Rule for Courts-Martial [R.C.M.] 1003(b)(8)(A). An officer may be dismissed for offenses that, in the case of an enlisted soldier, could not result in a punitive discharge as a matter of law.

Not every case of adultery is a criminal offense under the UCMJ. *Manual for Courts-Martial, United States* (2016 ed.) [*MCM*], pt. IV, ¶ 62.c.(2). But, this case is. The loss of trust in an institution where trust is critical, the risk and consequences of distraction in combat, all underline why certain instances of adultery are proscribed. As such cases go, appellant's conduct is among the worst and therefore more likely to be closer to the maximum authorized punishment for the offense.

Moreover, the gravity of appellant's conduct was compounded when he then intentionally disobeyed his colonel's orders to stop the relationship. "It is the commander, not the subordinate, who must assess these competing concerns and develop command priorities." *United States v. Rockwood*, 52 M.J. 98, 108 (C.A.A.F. 1999). "Given the destructive weaponry that our nation entrusts to our military

---

[3] In assessing the appropriateness of appellant's sentence, we limit ourselves to the record of trial as clarified by our superior court. *See, e.g.*, *United States v. Healy*, 26 M.J. 394, 396-97 (C.M.A. 1988). On appeal, in order to show his counsel were ineffective, appellant submitted awards, commendations, and statements that were not introduced by his trial defense team. And, as it turns out, we agree that this additional information may be persuasive. But, our review of the appropriateness of the sentence is limited to the case as it was tried, not *as it could have been tried*. That is, the record on appeal is different when we consider the question of the appropriateness of the sentence than when we consider whether counsel were ineffective.

[4] As one example, Article 90, UCMJ, mandates obedience to a commissioned officer's lawful orders. The oath taken at enlistment requires obedience to "orders of the officers appointed over me." 10 U.S.C. § 502.

leaders, there is no other way to control and direct the awesome power that is vested in the armed forces." *Id.*

Not only did appellant disobey the order, but he did it in a manner that aggravated the offense. The text messages sent by MAJ Scott reveal an officer who bullies and demands sex, an officer who is profane and sometimes obscene, who harasses and threatens, and who mocks the possible death of Mrs. AM's husband in combat. While appellant was not charged with threatening or stalking Mrs. AM, it is certainly aggravating that appellant violated COL Harvey's order in a manner that was neither a minor technical violation nor a well-intentioned misstep.

One must think hard to conjure a worse case of adultery than when a field grade officer knowingly has a long-term sexual relationship with the spouse of an enlisted soldier who is deployed in combat, and then egregiously disobeys direct orders to end the relationship. Appellant's sentence to dismissal is appropriate.

## B. Ineffective Assistance of Counsel

In affidavits submitted on appeal, CPT JH and CPT MD express shock that the court-martial adjudged a dismissal. Captain JH describes the sentence as "ludicrous" and "unconscionable." Captain MD similarly describes MAJ Scott's sentence of a dismissal as "unconscionable" and an "absurdity."

Reading their affidavits, one cannot help but conclude that counsel prepared for the court-martial under the grossly mistaken belief that a dismissal was not a plausible outcome.

Our conclusion that the defense team prepared for a trial based on the assumption that a dismissal was not a plausible sentence is not merely based on our informed inferences. In his affidavit CPT MD states, "I believed the odds of a punitive discharge at this court-martial were so unlikely that the main concern for us going into pre-sentencing was hoping to prevent MAJ Scott from serving time in confinement." The pretrial agreement in the case capped confinement at 119 days. According to CPT MD, the focus of the defense sentencing case was whether MAJ Scott would serve less than 119 days confinement, not on whether he would be dismissed and lose a pension and all the associated benefits that flow from being a military retiree.

That a dismissal was a plausible sentence should have been obvious. First, this case was not a typical adultery offense. While one might argue a dismissal is not a typical sentence for a typical case of adultery, this case was atypical. Second, a dismissal is an authorized punishment under R.C.M. 1003, and counsel should have prepared accordingly. The court-martial is given the broad discretion to adjudge any lawful sentence. *See* R.C.M. 1002. Third, even if counsel were under a

mistaken belief that the offenses were minor, there were several pretrial events that should have shaken that belief. The preliminary hearing officer rejected recommending an alternative disposition of the case and specifically recommended trial by general court-marital. The Staff Judge Advocate reviewed the file and recommended trial by general court-martial. The pretrial agreement severely limited confinement, but contained no restrictions on the convening authority's ability to approve a sentence to a dismissal.

*1. What was MAJ Scott's sentencing case?*

The defense sentencing case played out as one might expect when counsel think the accused's sentence exposure is limited to 119 days of confinement.

The defense did not mark or admit a single exhibit.

Three local witnesses were called.

Colonel Harvey (whose order MAJ Scott violated) was called to testify about his observation of the accused's duty performance during a seven-month period. The colonel testified that the accused submitted work to standard, and sometimes above standard. On cross-examination, COL Harvey agreed that MAJ Scott's conduct was so detrimental to good order and discipline that it needed to be snuffed out immediately. When asked about whether it was wrong for a field grade officer to commit the offenses MAJ Scott had pled guilty to, COL Harvey corrected the trial counsel and stated it was wrong for a person of any rank. Finally, COL Harvey agreed that MAJ Scott had told him the affair had ended, which was not true.

The next witness was COL Halverson. Colonel Halverson had replaced COL Harvey, and had taken over supervising MAJ Scott. Colonel Halverson supervised appellant for six months. During that time, MAJ Scott "perform[ed] tasks as assigned." When asked about his duty performance, COL Halverson testified, "He's completed all of his tasks either on time or ahead of time. He comes into work and does what we ask him to do." While COL Halverson testified that MAJ Scott had high rehabilitative potential in or outside of the military, it does not leap off the page as a strong endorsement.

The third and last witness was Chief Warrant Officer Five (CW5) Israel. Mr. Israel had also worked with MAJ Scott in the same office as COL Harvey and COL Halverson. Mr. Israel testified that he would rank MAJ Scott as "above the middle" of the officers with whom he had previously served.

In summary, all three witnesses were called from appellant's immediate office. All gave a middling assessment of appellant's performance, and none could testify about MAJ Scott's service that predated his misconduct. None had served

6

with him in combat. While a pretrial agreement removed the government's obligation to produce defense witnesses, the defense was free to present evidence regarding appellant's prior service through other means. No witness was called telephonically. No witness statement was presented. No fitness report was introduced. The only evidence of appellant's awards and decorations was the list of award acronyms contained on his Officer Record Brief (ORB) – which was authenticated and introduced by the government.

The government, in stark contrast, came to trial loaded for bear. The government maintained no disillusions as to whether the sentence should include a dismissal. The government's sentencing argument asked for de minimus confinement (a fraction of the 119 days authorized by the pretrial agreement) and focused entirely on why MAJ Scott should be dismissed from the Army.

After the sentence was announced, what was not done at trial was later done as part of appellant's R.C.M. 1105 submission. Captain MD submitted hundreds of pages of documents for post-trial consideration. Several letters of support were submitted. Medical documents were prepared and provided to the convening authority for consideration. Major Scott's post-trial submission lands on our desks with twice the thickness of the trial transcript and all exhibits combined.[5] It was not too little, but it was *too* late. Even were he so inclined, the convening authority was not empowered to set aside appellant's dismissal under Article 60, UCMJ.[6]

To obtain relief for ineffective assistance of counsel, appellant bears the burden of establishing both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The difficulty of appellant's burden to establish ineffective assistance of counsel — and it is his burden — was summarized by the Supreme Court as follows:

> It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The

---

[5] However, the R.C.M. 1105 matters still did not include awards, fitness reports, or statements from witnesses who could provide the convening authority with an assessment of appellant's duty performance beyond his current duty location.

[6] On behalf of appellant, CPT MD requested that as a matter of clemency the convening authority make a "recommendation" for a "resentencing." We are not sure what was meant by this. This Court does not order rehearings as a matter of clemency. *United States v. Nerad*, 69 M.J. 138, 147 (C.A.A.F. 2010). In any event, the convening authority approved the sentence as adjudged.

7

> question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotations and citations omitted).

In his initial brief to this court, MAJ Scott raises several arguments as to why his counsel were deficient. Not all are persuasive.[7] We address in detail two concerns: the failure to introduce any documentary evidence regarding MAJ Scott's career, and the failure to call witnesses who would testify to MAJ Scott's service before the misconduct and while serving in combat.

### 2. Additional information submitted on appeal

Claims of ineffective assistance of counsel often involve facts not contained in the record of trial. It is often the case that trial decisions that appear questionable based on the cold appellate record are easily explained when we are informed of other facts. For example, counsel may withhold evidence because they fear they will open the door to unfavorable character or rebuttal evidence. If the strategy works, the record will be silent and counsel's tactical decision will not be obvious. If a client is deceitful or uncooperative with their attorney, the attorney may make decisions that in hindsight are questionable or look ill-advised. We order affidavits so the counsel have the opportunity to present this court with the full picture. Thus, we directed the government to obtain affidavits from CPT MD and CPT JH to provide them the opportunity to rebut the allegation they were ineffective. *See generally United States v. Melson,* 66 M.J. 346 (C.A.A.F. 2008). Our order directing affidavits was two pages long and required that "at a minimum" the affiants address a list of issues raised by appellant's brief.

Captain JH's response was less than a page, terse, and in the end, not at all helpful. A third of the response is directed at complaining about the court-martial unrelated to our questions or appellant's claim of ineffective assistance.[8] Captain JH

---

[7] We reject MAJ Scott's claim that his counsel were deficient in preparing him to give his unsworn statement. We also reject MAJ Scott's claim that his counsel did not explain to him that he could call witnesses telephonically as this is directly contradicted by the plain language of the pre-trial agreement he signed.

[8] At trial, the defense objected to the inability to cross-examine a victim's unsworn statement. This objection was repeated in the R.C.M. 1105 submission. Unusually,

(continued . . .)

ends his statement by telling this court, "Given the ludicrously disproportionate sentence, either the defense team was ineffective or the proceedings were fatally flawed, there is no third option." While we reject being presented with a false dilemma, it does not necessarily mean that CPT JH was wrong.

Like CPT JH, CPT MD all but admitted that he was ineffective, writing "I would ask the court to find any of my actions or inactions ineffective in order to provide some justice for MAJ Scott." Whether a counsel is ineffective is an objective inquiry. *See Harrington v. Richter*, 562 U.S. 86, 104 (2011). Regardless of whether it is favorable or unfavorable, we give little weight to counsels' subjective assessment of their own performance and instead conduct an objective assessment of their performance. *Id*. at 109-10. "*Strickland*, however calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id*. at 110 (citations omitted). We have recently rejected a counsel's admission that he was deficient at trial. *See United States v. Tovarchavez*, 2018 CCA LEXIS 371, at *22-24 (Army Ct. Crim. App. 19 Jul. 2018) (petition for cert. granted on other grounds).

---

(. . . continued)

given that both counsel are addressing claims they were ineffective, counsel also directly address this court in their affidavits asking us to grant relief to MAJ Scott for this claimed error. Captain JH writes, "To allow such an unconscionable sentence to stand . . . after abrogating MAJ Scott's constitutional rights to the cross examination of witnesses, is a blight on the integrity of the military justice system and renders moot any appearance of fairness in the proceedings." For such a strongly held conviction, however, counsel cited no case law, statute or other authority for their position. As it turns out, all authority goes the other way. Rule for Courts-Martial 1001A(e) specifically allows for unsworn victim statements not subject to cross-examination. Both the CAAF and the Supreme Court have stated the right to confront adverse witnesses is a trial right that does not extend to sentencing proceedings. *United States v. McDonald*, 55 M.J. 173, 177 (C.A.A.F. 2001) ("it is only logical to conclude that the Sixth Amendment right of confrontation does not apply to the presentencing portion of a non-capital court-martial."); *Williams v. New York*, 337 U.S. 241, 245-51 (1949). There is no constitutional right to confront a victim's unsworn statement at sentencing. *Id*.

We are left with the impression that counsel wrongly assumed, without conducting sufficient legal research and contrary to the plain language of the rule, that they would be able to either prevent the admission of the unsworn statement or attack the weight of the unsworn statement through cross-examination.

9

Captain MD's affidavit was, at least by contrast, thorough. Captain MD adequately explains that before the pretrial agreement was accepted, the focus of the defense effort was heading off the possibility of sexual assault charges. Although this could have been laid out in more detail, it is a reasonable tactical decision to devote resources and attention to try to take more serious offenses off the table. Also adequate is CPT MD's explanation for preparing the accused's unsworn statement. Captain MD's explanation for failing to obtain an accounting of the net present value of MAJ Scott's retirement benefits is unconvincing,[9] but in this judge alone trial, we see no prejudice.

However, CPT MD's response as to why the defense introduced no evidence regarding MAJ Scott's over twenty-year military service requires more analysis.

### 3. Failure to introduce fitness reports and awards

As noted above, the defense did not mark or admit a single document regarding MAJ Scott's over twenty years of service.

CPT MD explained that the reason no documents or evidence were introduced was because "we believed that the information MAJ Scott could provide the court [in his unsworn statement] and his extensive deployment record documented on his ORB would suffice for pointing to his service record knowing the case was before a military judge alone."[10]

---

[9] Captain MD stated that because the pretrial agreement was signed only two weeks before trial, there was not enough time to obtain an accounting of the value of MAJ Scott's retirement from the Army Audit Agency. We find this explanation unconvincing for a few reasons. First, CPT MD elsewhere in the affidavit specifically stated that he had discounted the possibility of the court-martial adjudging a dismissal and was focused on limiting any term of confinement. Second, while the flash-to-bang from referral to trial was relatively quick, the defense team had been working on the case for months. Third, counsel did not request a continuance. Fourth, the pretrial agreement did not contain a term requiring the defense to accept the earliest possible trial date.

[10] Captain MD explained that after requesting MAJ Scott to provide documentary evidence regarding his career, the only document provided was an unsigned recommendation for a Distinguished Flying Cross that was later downgraded to an Air Medal. Captain MD does not explain whether he then followed up with MAJ Scott, or why he did not ask appellant to produce his entire personnel file for review by his attorney.

There is no cookie-cutter template for how to present a presentencing case. While presenting a "good soldier book" of an accused's military accomplishments is common, it does not amount to a per se requirement of competent counsel. Not every soldier convicted of a crime has a favorable military personnel file worthy of showing the factfinder.

We find two faults with CPT MD's reasoning.

First, we find no reasonable tactical reason why counsel did not do more to investigate and seek out information regarding appellant's military career. Major Scott devoted over two decades of his life to service for his country. While his ORB noted his deployments, it did not tell the court-martial about what MAJ Scott did while deployed. A factfinder may give substantially different weight to a deployment spent as a staff officer in the relative safety of a major base vice one spent as a front line attack pilot who repeatedly flew towards and into direct fire engagements with the enemy.

Counsel will not be able to make an informed decision whether to admit such documents without looking at them first.

Second, there is danger in relying on an unsworn statement to put facts before the court-martial. The statement is not under oath and it is not subject to adversarial testing. While the court-martial must consider an unsworn statement, the court may give it less weight simply because it is unsworn. True, MAJ Scott discussed some of his deployments during his unsworn statement. However, when an accused is asked to give an unsworn statement as to his own heroics, the unsworn statement may be viewed less credibly. This is especially true when the claim of heroics is not supported by awards, witnesses, or other confirmatory evidence.

Accordingly, we agree with the spirit behind CPT JH and CPT MD's self-evaluation of their performance contained in their respective affidavits. But, before we can grant relief for ineffective assistance of counsel we must consider *Strickland's* second prong; whether there is a reasonable probability that the sentence would have been different had MAJ Scott's awards and fitness reports been admitted during his sentencing case. 466 U.S. at 687.

The officer evaluation reports submitted to us on appeal begin when MAJ Scott was a lieutenant and extend through the time of the charged offenses. The reports sometimes use lofty terms. When compared to the hyperbole that often

accompanies such reports, our overall assessment is they are lackluster.[11]  As a court-martial would likely see them in a similar light, we do not find a substantial likelihood that if the fitness reports had been submitted the court-martial would not have adjudged a dismissal as a sentence.

Similarly, we find no prejudice from the failure to submit copies of MAJ Scott's awards for the court-martial's consideration.  We were provided a copy of the award citations, but not provided the detail that is often found in an award recommendation.  *See* Dep't of Army, Form 638, Recommendation for Award (1 Apr. 2006).  Thus, the information we have is not substantially different than what was contained in MAJ Scott's ORB that the government entered into evidence.  Accordingly we do not find MAJ Scott met his burden of establishing prejudice for the failure to obtain and introduce copies of his fitness reports and awards.

*4. Failure to call witnesses from Major Scott's prior service*

Our analysis is different when it comes to MAJ Scott's claim that his counsel failed to interview and call sentencing witnesses.

Appellant swears to us in an affidavit that he told his counsel that COL Fee, CW5 Norris, and three other witnesses should testify during his sentencing case.  Captain MD and CPT JH do not directly contradict appellant, but swear in their affidavits that they interviewed every sentencing witness that MAJ Scott brought to their attention.  Colonel Fee and CW5 Norris, in turn, both swear they were never contacted by the defense.

Obviously, not all claims can be true.

Colonel David Fee was MAJ Scott's battalion commander during a fifteen-month deployment to Iraq.  Colonel Fee describes MAJ Scott as "loyal to a fault and a fearless warrior who personally saved the lives of countless Americans in combat."  As but one example, COL Fee describes a harrowing nine-hour battle in which MAJ Scott flew under a 200-foot cloud deck and repeatedly returned to engage and kill an enemy who were within small arms range of his aircraft.

---

[11] In the evaluations that were submitted for our consideration, we could not find one that ranked MAJ Scott as "above center of mass" or "most qualified."  The senior rater comments in an early evaluation began "1LT Scott continues his development as a talented and capable attack helicopter platoon leader."  A later senior rater comment began, "CPT Jason Scott is an absolutely outstanding officer and in the top half of the Captains I senior rate."

Similarly, CW5 Rusty Norris repeatedly flew with MAJ Scott in Afghanistan. As the battalion standardization pilot, Mr. Norris was particularly well-suited to observe MAJ Scott. Mr. Norris said of MAJ Scott, in a direct comparison to other pilots in the battalion, "when the bullets started flying, Major Scott always wanted to be in the front at the tip of the spear."

The Rules for Courts-martial have specific provisions for introducing sentencing evidence regarding an accused's bravery. Rule for Courts-Martial 1001(c)(1)(B) allows for an accused to introduce matter in mitigation, and it includes "particular acts of good conduct or bravery." That is, unlike other mitigation evidence, evidence of bravery is not limited to one's reputation and the defense may introduce specific acts.

Accordingly, we cannot avoid the factual dispute contained in the conflicting affidavits. Did MAJ Scott tell his attorneys about COL Fee, CW5 Norris, and three other witnesses?

Therefore, we remand this case for an evidentiary hearing pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967), to answer the following questions:

1. Did MAJ Scott tell either CPT JH or CPT MD the names of COL Fee, CW5 Norris, and the other three witnesses listed in his affidavit?

2. Did CPT JH or CPT MD contact COL Fee, CW5 Norris, and the three other witnesses listed in the affidavit?

3. If yes to any or all witnesses listed in question (2), was there a strategic or tactical reason not to call the witness(es) to testify during pre-sentencing proceedings?

## CONCLUSION

Upon consideration of the entire record, the findings of guilty are AFFIRMED.

In light of this court's inability to resolve conflicting affidavits presented on appeal, we are unable to affirm the sentence in this case without additional fact-finding. The record of trial is returned to The Judge Advocate General for such action as is required to conduct a *DuBay* hearing to answer the three aforementioned questions.

Upon conclusion of the *DuBay* hearing, the record will be returned to this court for further review.

SCOTT—ARMY 20170242

Judge SALUSSOLIA and Judge ALDYKIEWICZ concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

14