***CORRECTED COPY – DESTROY ALL OTHERS***

# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40193**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Colin R. COVITZ**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 30 September 2022[1]

————————————

*Military Judge:* Colin P. Eichenberger.

*Sentence:* Sentence adjudged on 18 June 2021 by GCM convened at Creech Air Force Base, Nevada. Sentence entered by military judge on 8 September 2021: Dismissal, confinement for 8 months, and forfeiture of all pay and allowances.

*For Appellant:* Scott Hockenberry, Esquire (argued); Major Matthew L. Blyth, USAF.

*For Appellee*: Major John P. Patera, USAF (argued); Major Lecia E. Wright, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and MEGINLEY, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Judge ANNEXSTAD and Judge MEGINLEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

[1] The court heard oral argument in this case on 29 June 2022.

KEY, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of four specifications of domestic violence, in violation of Article 128b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928b.[2] Appellant chose the military judge as the sentencing authority and was sentenced to a dismissal, confinement for eight months, and to forfeit all his pay and allowances.

Appellant has raised five issues on appeal: (1) whether the military judge erred by denying challenges for cause against multiple panel members; (2) whether the military judge erred by preventing cross-examination about certain matters; (3) whether the military judge erred in instructing the panel members that they could find Appellant guilty via exceptions and substitutions that would have created a fatal variance; (4) whether Appellant's convictions are legally and factually sufficient; and (5) whether Appellant was denied the right to a unanimous guilty verdict.[3] We decide the first issue in Appellant's favor, and we set aside the findings and the sentence. As a result, we do not reach the remainder of the issues he has raised.

## I. BACKGROUND

### A. Appellant's Offenses

Appellant's convictions arose from allegations he assaulted Ms. CC, his former girlfriend, on 10 February 2020. Appellant had moved to Las Vegas in 2016 after he received orders reassigning him to nearby Creech Air Force Base. While living in Las Vegas, he met Ms. CC, who was a local civilian woman, and the two began dating. Ms. CC and her two teenage sons moved in with Appellant in January 2017, and in June 2017 all four moved into a new house which Appellant had purchased. In January 2018, Appellant and Ms. CC broke up, but all four remained in the house together. Shortly thereafter, Ms. CC began seeing Major (Maj) RW, a drone pilot with whom Appellant regularly performed missions.[4] Later that year, Appellant sought to revive his relationship

---

[2] Unless otherwise noted, all references in this opinion to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant personally raises issue (5) pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A. 1982).

[4] During her testimony, Ms. CC said she would not say that she and Major (Maj) RW were dating, but she agreed they were "more than friends" and had a sexual relationship. Maj RW described their relationship as "friends with benefits off and on" beginning in late 2017.

with Ms. CC, and the two were discussing marriage by November 2018. Meanwhile, Appellant and Ms. CC made a room in the house available for short-term rentals via an online booking platform.

Appellant deployed from April 2019 to October 2019. In December 2019, Appellant decided to rent and move into a room elsewhere in the city while Ms. CC and her children remained in Appellant's house. Appellant and Ms. CC continued to see each other periodically, and on 10 February 2020 they went out to lunch with plans to return to Appellant's house afterwards. As Ms. CC drove Appellant back to the house, they began arguing about one of Appellant's two cats which had gone missing from the house a few days earlier. In essence, Appellant accused Ms. CC of being inattentive to the cats, failing to notice the one cat had disappeared, and then not putting in much effort to find the cat. Ms. CC disputed these allegations as her dashboard camera recorded the argument.

According to Ms. CC's testimony at trial, once she and Appellant arrived at the house and walked into the kitchen, the argument turned physical with Appellant pushing her into the refrigerator and then into a "barrier" Ms. CC had constructed to keep Appellant's cats out of the kitchen. This caused the barrier to fall into the house's "atrium" near the stairs leading up to the master bedroom and the rental bedroom.[5] Ms. CC tried unsuccessfully to pick up the barrier while she and Appellant continued to argue. At some point, Ms. CC managed to activate a recording function on her phone which made an audio recording of the events. The altercation moved to the adjoining living room, where Ms. CC fell on the ground after Appellant pushed her. Ms. CC said Appellant put one knee on her stomach and then used one of his hands to strangle her briefly, and the altercation ended shortly thereafter.

About a week later, Ms. CC had dinner at Maj RW's house along with a mutual friend. Ms. CC showed the two men pictures of her bruises and played a part of the recording of her argument with Appellant. Although Maj RW worked with Appellant, he did not report the incident because he "didn't have both sides of the story" and he "didn't feel like [he] wanted to get involved with her business at that point."

After another week passed, Appellant sought a protective order against Ms. CC from the civilian authorities, leading Ms. CC to seek a similar order against Appellant. A joint hearing on the orders was held in early March 2020 before a Clark County Family Court judge during which both Appellant and Ms. CC testified; Ms. CC also played portions of her recordings for the judge. A repre-

---

[5] Based upon trial testimony, this "atrium" is the house's interior entryway.

sentative from the base Family Advocacy Office who was observing the proceedings subsequently notified military law enforcement authorities about the assault allegations, and a military investigation was initiated. Ultimately, Appellant was charged with and convicted of four specifications of domestic violence related to the 10 February 2020 altercation (strangling Ms. CC, pushing her in the chest, grabbing her wrists, and pinning her to the floor). Appellant was acquitted of a fifth specification of domestic violence which alleged he had grabbed Ms. CC's shirt collar in December of the prior year.

During Appellant's trial, one court member asked if the panel could be provided a "top down drawing view of the kitchen, living room, garage, and where [Appellant and Ms. CC] were initially/originally standing during the conversation before contact was made." Later, another member asked about the orientation of the barrier, where Appellant and Ms. CC were standing when it fell, where it landed, and where the two were standing afterwards.

## B. Court-Martial Members

Fourteen members were detailed to Appellant's court-martial. For voir dire, the military judge first asked the members as a group a number of general questions. Afterwards, counsel for both parties were permitted to ask the entire panel questions. Once the group voir dire concluded, the military judge and the parties determined that each of the members should be called back for individual voir dire. When the members were individually called back in for follow-up questioning, the military judge proceeded to question the members, allowing counsel for the parties to ask follow-up questions.

At the conclusion of this process, trial counsel and the Defense agreed to excuse two members.[6] The Defense then challenged one member whose sister had been the victim of domestic violence, and the military judge granted this request on an implied-bias theory over government objection. The Defense next challenged a member whose mother and sister had been victims of domestic violence, and the military judge granted this challenge as well, bringing the number of members down to ten. As discussed in greater detail below, trial defense counsel then challenged four more members, but the military judge

---

[6] The military judge concluded both of these members were "subject to challenge for cause for actual bias." The first member knew both Appellant and Maj RW. Prior to the court-martial, Maj RW had told this member about seeing bruises on Ms. CC, and the member had counseled Maj RW not to confront Appellant about the matter. The second member had both a cousin who had been killed in a domestic violence incident and several other family members accused of committing domestic violence. This member told the military judge that he could not say with certainty that these facts would not bias him, as the experiences had led him to be "more sympathetic towards believing victims or potential victims."

denied all four challenges. Both the Government and the Defense used their peremptory challenges, reducing the panel size to eight—the number required for a general court-martial—with the Defense using its peremptory challenge against one of the four members it had unsuccessfully challenged for cause. The military judge's denials of the Defense's challenges to the four members are at issue here; those four members are Lieutenant Colonel (Lt Col) KB, Maj MP, Maj JR, and Captain (Capt) GL.[7]

### 1. Maj MP

#### a. Individual Voir Dire

After being called back for individual voir dire, Maj MP told the military judge he had been in the same unit as Appellant from 2016 to 2018 and that they had a relationship which was "just professional." He explained they would interact "a dozen times a month" and have conversations which would last between 30 minutes and two hours, but they did not spend any time together outside of their duty location. Although Maj MP did not keep in touch with Appellant after 2018, Maj MP said he had followed Appellant's career since then. When asked what he thought about Appellant, Maj MP answered, "I had a high opinion of [Appellant]. He was exceptional."

Maj MP also said he knew Maj RW, an anticipated witness in the case. Maj RW had been "one of [Maj MP's] troops" at one point, and the two had interacted with each other "over the last five years." Maj MP described their interactions as, "Not consistent enough to say I've been to his house or see him on weekends, but run-ins. I just had a conversation with him three days ago for about 45 minutes about how his life is going, how my life is going." Maj MP described his relationship with Maj RW as "professional," and that they interacted "probably about three to four times a month currently," although there had been a period of two years where the two did not talk at all. When the military judge asked Maj MP what the general nature of his interactions with Maj RW was, Maj MP answered, "Let's call it personal advice. We both shared similar interests in toys. Obviously, 'toys' as in like cars, you know, vehicles, stock market, how he's doing in the city." The military judge asked Maj MP what he meant by "in the city," and Maj MP said, "As in like his additional endeavors like, you know, basically he's one of those individuals that is smarter than I am, so I've got to bend the ear sometimes to learn a little bit about how he's making his ends meet." When asked whether he had a particularly high or low opinion of Maj RW, Maj MP replied, "High opinion. He's incredible."

---

[7] We conclude the military judge did not abuse his discretion in denying the Defense's challenge of Captain (Capt) GL whose wife had been abused as a child and was pursuing a social work degree. We do not further discuss this challenge.

Maj MP knew another potential witness in the case, Capt SS, whom Maj MP said he worked with daily for a period lasting between six months to a year. The military judge asked Maj MP his opinion of Capt SS and he answered, "Another well-deserved troop at the time, so high opinion of [her]."[8]

Responding to questions from the military judge, Maj MP indicated he would use the same standards in weighing and evaluating the testimony of each witness in the case. The military judge asked Maj MP how he could be confident he would not give "more weight or credibility" to the testimony of witnesses that he knew versus witnesses he did not know. Maj MP answered, "Well, in this event, in this position, I am not looking at them as individuals. I am just listening to the words that they are providing."

### b. Challenge

The Defense challenged Maj MP on implied bias grounds based on his knowledge of both Appellant and Maj RW, whom trial defense characterized as "a central witness" who would be presented by the Government as "an outcry witness" and to testify that "he saw at least some of [Ms. CC's] alleged bruises." Trial defense counsel explained that Maj RW was in a relationship with Ms. CC "throughout a significant period that's at issue in this case, and may very well still be in a relationship with [Maj RW]." Trial defense counsel pointed to Maj MP's "very high opinion" of Maj RW and told the military judge that Maj RW was "very financially well off" based upon some profitable investments he had made. The relevance of Maj RW's financial status, according to trial defense counsel, was that Maj MP essentially said he "goes to [Maj RW] for financial advice. . . . It's where [Maj MP] is literally going to somebody who has had a significant amount of success financially and both [sic] in his career and asked him for advice." Trial defense counsel argued that Maj MP was relying on Maj RW's advice on "potentially major life and financial decisions." Trial defense counsel pointed to the length of the conversations and the fact that Maj MP and Maj RW had a long conversation just days before the court-martial, as well as the fact that Maj RW was an adverse witness to Appellant—in no small part because Maj RW was in a relationship with Ms. CC, Appellant's former girlfriend and victim in the case. The Defense also noted Maj RW's affiliation with the potential defense witness, Capt SS.

The Government opposed the challenge. In doing so, trial counsel conceded Maj RW was "a key witness" and "an important part" of the Government's case; he also acknowledged that the Defense's characterization of Maj RW's expected testimony was "rather accurate." Although trial counsel noted that Capt SS

---

[8] Capt SS had been listed as a potential defense witness; however, she was never called to testify.

was a Defense witness, trial counsel did not respond at all to the Defense's allegation of Maj MP's bias with respect to Maj RW other than to say that because Maj MP knows Appellant, a Government witness (Maj RW), and a Defense witness (Capt SS), that outside observers "would see that as potentially balancing out in a way."

The military judge announced he had considered the challenge under actual and implied bias grounds and denied the challenge on both. As to actual bias, the military judge said he "had the opportunity to observe [Maj MP's] demeanor and ha[d] the opportunity to assess his credibility in response to questions posed," and that Maj MP

> clearly and unequivocally stated multiple times that he would decide this case based solely on the evidence presented, and the law as instructed by the [c]ourt. Would not give any particular witness's testimony more weight than any other witness's testimony because of that witness's position, status[,] or his personal relationship with the witness.

With regards to implied bias, the military judge noted that although Maj MP had interacted with Maj RW for approximately five years, "that was purely a professional relationship." The military judge said the two interacted "only three or four times a month" and that "there was a full two years where [Maj MP] didn't even talk to [Maj RW] because they were in different squadrons." Further, the military judge said that although Maj MP had a high opinion of Maj RW, Maj MP had

> indicated he had high opinions of each of the witnesses he was aware of, which includes [Capt SS], a potential defense witness, and [Appellant]. The fact that he has knowledge of a number of individuals that—or has had interactions with a number of the individuals that may be involved in this court-martial is not per se disqualifying.

The military judge said he had considered the liberal grant mandate and that he did "not find it to be a particularly close call based upon [his] limited interaction."

### 2. Lt Col KB

#### a. Individual Voir Dire

Prior to calling Lt Col KB back for individual voir dire, when the military judge was discussing with the parties the topics upon which he intended to question Lt Col KB, the following colloquy took place:

> ADC [Area Defense Counsel]: . . . Defense has knowledge that [Lt Col KB] actually for a brief time was renting a room at the

actual house where this occurred. That's—at least, that's something that's relevant to ask him about. None of the voir dire questions elicited that, but in full candor, the [c]ourt—

MJ [military judge]: Who owns the home where this incident occurred?

ADC: Our client does, sir.

MJ: So your client had a landlord/tenant relationship with [Lt Col KB]?

ADC: It was an Airbnb style, but, yes, Your Honor.

MJ: What are the timeframes that you are aware he shared that room?

ADC: May I have a moment?

MJ: Why don't we do this, because there is no way the court would know this on its own, what I intend to do is open it up to counsel if there are additional areas of inquiry. That is an area of inquiry I'll allow you to ask about, and I'll allow you to do [sic] during the individual voir dire. The [c]ourt is not inclined to do it.

When called for individual voir dire and, in response to the military judge's questions, Lt Col KB explained that his sister had been a victim of domestic violence at the hands of her husband around five years before Appellant's court-martial. Lt Col KB said he was not particularly close to his sister, that he only learned of the abuse from his father during his sister's divorce proceedings, that he only spoke to his sister about the abuse on one occasion, and that he never thinks about it. The military judge asked Lt Col KB whether his sister told him "about exactly what happened, the impact, or was it brief?" Lt Col KB answered, "All of the above. It was really just, 'This is what happened. This is why we're getting a divorce,' and that was pretty much the conversation." The military judge then asked about the impact of learning this news, to which Lt Col KB responded, "I felt bad for her. I was glad that she decided to get out of the relationship." When asked whether he thought about his sister's abuse when he read the charges, Lt Col KB told the military judge, "No, not really." The military judge asked Lt Col KB whether he thought his sister's abuse would impact his ability to be a fair and impartial panel member, and Lt Col KB answered, "I don't believe so." Lt Col KB went on to explain that "every situation deserves a look in the right context" and that his sister's situation "could be totally different than this situation." He also said that if he were to return a finding of not guilty, he would not feel as if he was letting his sister down or disappointing her.

8

After the military judge finished his questions, the trial counsel responsible for the voir dire of Lt Col KB indicated he intended to ask questions about "information the [D]efense brought up earlier." Trial counsel asked Lt Col KB if he knew Appellant; he answered, "I do not." Trial counsel then said, "Some information came up that you may have or may have not . . . rented a room here in Vegas from—and it's potentially [Appellant's]." Lt Col KB responded, "So maybe." He then explained he had rented a room during March 2019, as part of his reassignment to the Las Vegas area, leading trial counsel to ask, "did you recognize [Appellant] as you walked into the room today?" Lt Col KB answered, "I did not, but now that you bring it up. . . . Yes. That's yes." Lt Col KB went on to explain that he and his wife were in Las Vegas looking for a house for about a week, and he spoke with Appellant "two or three times"— conversations which were "[n]ot more than 15-ish minutes." In these conversations, they spoke about Lt Col KB's assignment, but Lt Col KB said he did not form a general impression about Appellant.[9] Lt Col KB remembered children being in the house along with Appellant's "wife or girlfriend," whom Lt Col KB did not meet or interact with. When asked if there were "[a]ny memorable interactions," Lt Col KB replied, "The whole thing was pretty low key. We just rented a place to stay while we were house hunting." Trial defense counsel only asked Lt Col KB two questions: to verify the date of the room rental and what injuries his sister suffered from her abuse; Lt Col KB said he did not know the extent of his sister's injuries.

### b. Challenge

Trial defense counsel lodged an implied bias challenge against Lt Col KB based upon his sister's abuse as well as his "personal knowledge of the alleged crime scene" due to the week he stayed in Appellant's house. Trial defense counsel said, "[T]here's no doubt the photographs of the house will be introduced into evidence" and that Lt Col KB "inevitably had been in multiple locations at the alleged crime scene," based upon where the offenses took place. The Defense also highlighted the fact Lt Col KB's sister had been a victim of "fairly recent" domestic violence. Trial counsel opposed the challenge, arguing Lt Col KB only "vaguely remembered interactions" with Appellant and was merely aware that children and "an ex-girlfriend or a girlfriend" also lived in the house.

The military judge asked the parties for additional information regarding the room rental saying, "the [c]ourt's primary area of inquiry, trouble with this particular individual, is that that [sic] rental that occurred." Trial defense

---

[9] The Defense later proffered that Appellant was away at pre-deployment training during the time Lieutenant Colonel (Lt Col) KB and his wife were in the house.

counsel responded that the condition of the house was "not going to be the central focus of the case, but may come into issue here,"[10] and that the Defense anticipated prosecution exhibits which included photographs of the interior of the house along with an audio recording made in the house. Regarding the recording, trial defense counsel explained that the sound of the barrier hitting the ground could be loudly heard, and that how the barrier came to fall would be a matter of dispute in the trial.[11] Trial defense counsel said that Lt Col KB "undoubtedly will have knowledge as to that barrier" and "might have personal knowledge as to the physical dimensions of that barrier and particular location." Trial counsel conceded the Government would be presenting a photograph of the barrier to the members, but argued there were no anticipated issues with respect to the layout of the house or things in the house.

The military judge denied the challenge, saying he had considered it on both actual and implied bias grounds. In determining Lt Col KB was not actually biased, the military judge said he found Lt Col KB "to be forthright, honest[,] and credible." In terms of implied bias, the military judge noted Lt Col KB was not particularly close to his sister, had only one conversation with her about the abuse, had a "lack of really much knowledge about the abuse his sister suffered," and did not think about the incident at all. The military judge also pointed to the "lack of impact" the abuse had on Lt Col KB.

Regarding Lt Col KB having rented a room in Appellant's house, the military judge said Lt Col KB did not initially recognize Appellant, had no interactions with the children or Ms. CC, did not form an opinion about Appellant, and "[t]here were no memorable interactions." The military judge continued,

> Even having considered the additional inputs of counsel on some of the issues that will come up here, number one, the [c]ourt would note that this member was not asked about his knowledge of cats, not asked about his knowledge of a barrier in the home, was not asked about his knowledge or of [sic] appearance of the children in the home. This [c]ourt has no information about whether this member even recalls any of that. The layout of the home does not appear to be, as conceded by defense counsel, particularly essential to this case or important to this case.

---

[10] Trial defense counsel suggested the Government might seek to elicit evidence about the appearance of Ms. CC's children, Appellant's cats, and the house in general, apparently in furtherance of a theory that Ms. CC was a poor caretaker.

[11] Prior to conducting voir dire, the military judge heard and ruled on a motion to suppress statements Appellant made during the hearing before the Family Court judge. In support of that motion, the Defense attached a recording of the hearing which included Ms. CC playing her recordings of the altercation between herself and Appellant.

The military judge then said he had considered *United States v. Rockwood* "for the proposition that some amount of knowledge of the facts of a case does not per se disqualify a court-martial member." *See* 52 M.J. 98, 105–06 (C.A.A.F. 1999). He said he considered the liberal grant mandate, "but did not find this to be a particularly close call," and denied the Defense's challenge.

### 3. Maj JR

Maj JR explained that approximately eight months before Appellant's court-martial, she started volunteering at a local shelter for women who were victims of domestic violence. Maj JR's role was to lead hour-long yoga classes once or twice a month. The shelter prohibited volunteers such as Maj JR from talking to the shelter residents about the abuse they suffered and from interacting with the women at all outside the shelter. Maj JR said she went through a four-hour volunteer orientation at the shelter before she started leading the yoga classes, but there was no discussion of domestic violence itself during the orientation.

The Defense challenged Maj JR under an implied bias theory based upon her volunteering at the shelter. Trial defense counsel said the Defense might call an expert witness to testify about "biases within the system when they know the victim of domestic violence," which might conflict with Maj JR's experience at the shelter. The Government opposed the challenge, and the military judge denied it on both actual and implied bias grounds. The military judge concluded that providing services to victims or even treating victims of offenses at issue in a trial is not a per se disqualification from service as a member. The military judge said he considered the liberal grant mandate, but did "not find this to be a particularly close call."

## C. Peremptory Challenges

Once the military judge resolved the Defense's challenges for cause, the Government exercised its peremptory challenge against a member who was responsible for Appellant's professional development, had been working with Appellant on his next assignment the week prior to the court-martial, had heard rumors about the case, had a prior professional and personal relationship with Capt SS, and was hoping for "a positive outcome" from the court-martial for Appellant's sake. The Defense exercised its challenge against Maj JR.[12] This left eight members on the panel, the required minimum number.

---

[12] Appellant argues the military judge's denials of the Defense's challenges for cause impaired his peremptory challenge by forcing him to choose among adverse members in exercising that challenge. However, a successful peremptory challenge waives any error with respect to an earlier challenge for cause against that member. *See* R.C.M.

## II. DISCUSSION

### A. Law

An accused has "the right to an impartial and unbiased panel." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation omitted). A person detailed to a court-martial shall be excused whenever it appears he or she "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). Such is the case when a person "is closely related to the accused, a counsel, or a witness in the case . . . [or] has a decidedly friendly or hostile attitude toward a party." R.C.M. 912(f)(1)(N), Discussion. Potential court-martial members are subject to challenges for cause under actual bias and implied bias theories. *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020). Under the former, the question is whether the member personally holds a bias "which will not yield to the military judge's instructions and the evidence presented at trial." *Nash*, 71 M.J. at 88 (citation omitted). Claims that a military judge erred with respect to challenges alleging actual bias are reviewed for an abuse of discretion. *Hennis*, 79 M.J. at 384.

Our superior court has framed the analysis of implied bias as: considering the totality of the circumstances and assuming the public is familiar with the military justice system, "whether the risk that the public will perceive that the accused received something less than a court of fair, impartial members is too high." *United States v. Woods*, 74 M.J. 238, 243–44 (C.A.A.F. 2015) (internal quotation marks and citation omitted). "Implied bias exists when, 'regardless of an individual member's disclaimer of bias, most people in the same position would be prejudiced [that is, biased].'" *United States v. Briggs*, 64 M.J. 285, 286 (C.A.A.F. 2007) (alteration in original) (quoting *United States v. Napolitano*, 53 M.J. 162, 167 (C.A.A.F. 2000)). Our review of implied bias challenges is more deferential than de novo review, but less deferential than abuse of discretion. *Hennis*, 79 M.J. at 385. The test is objective, asking "whether, in the eyes of the public, the challenged member's circumstances do injury to the 'perception of appearance of fairness in the military justice system.'" *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007) (quoting *United States v. Moreno*, 63

---

912(f)(4), *Manual for Courts-Martial, United States* (2008 ed.); *see also United States v. Vanvalkenburgh*, No. ACM 39571, 2020 CCA LEXIS 157, at *7 (A.F. Ct. Crim. App. 13 May 2020) (unpub. op.), *aff'd*, 80 M.J. 395 (C.A.A.F. 6 Nov. 2020) (mem.) (concluding appellate review is precluded regarding a member who was peremptorily challenged). Because we conclude the military judge abused his discretion with respect to two other members, we do not further analyze Appellant's argument on this point.

M.J. 129, 134 (C.A.A.F. 2006)). Implied bias, however, "should be invoked sparingly." *Moreno*, 63 M.J. at 134 (citation omitted).[13] We consider the totality of the circumstances in determining "whether there is implied bias, namely, a 'perception or appearance of fairness of the military justice system.'" *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015) (quoting *United States v. Dale*, 42 M.J. 384, 386 (C.A.A.F. 1995)).

When an accused challenges members for cause, the military judge is required to liberally grant such challenges. *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005). Reasons for this include the fact that peremptory challenges in the military justice system are far more constrained than in the civilian criminal justice arena, as well as that convening authorities have broad discretion to detail members to courts-martial. *Id.* (citations omitted). "Challenges based on implied bias and the liberal grant mandate address historic concerns about the real and perceived potential for command influence on members' deliberations." *United States v. Clay*, 64 M.J. 274, 276–77 (C.A.A.F. 2007). "In other words, if after weighing the arguments for the implied bias challenge the military judge finds it a close question, the challenge should be granted." *Peters*, 74 M.J. at 34. The liberal grant mandate "also serves as a preventative measure because 'it is at the preliminary stage of the proceedings that questions involving member selection are relatively easy to rapidly address and remedy.'" *Id.* (quoting *Clay*, 64 M.J. at 277). Military judges who squarely address the liberal grant mandate on the record are given greater deference on appeal than those who do not. *Clay*, 64 M.J. at 277.

The burden in establishing the grounds for the challenge of a member lays with the party making the challenge. R.C.M. 912(f)(3). When a basis for challenge is first raised on appeal, we review such claims for plain error. *United States v. Ai*, 49 M.J. 1, 5 (C.A.A.F. 1998) (citation omitted).

Each party is entitled to one peremptory challenge. R.C.M. 912(g)(1). If a member who was unsuccessfully challenged for cause is subsequently excused by virtue of a peremptory challenge, such excusal "shall preclude further consideration of the challenge of that excused member upon later review." R.C.M. 912(f)(4).

---

[13] The United States Court of Appeals for the Armed Forces (CAAF) has explained this concept "reflects that where actual bias is found, a finding of implied bias would not be unusual, but where there is no finding of actual bias, implied bias must be independently established." *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

**B. Analysis**

**1. Maj MP**

Appellant argues the military judge abused his discretion when he denied the Defense's challenge of Maj MP. Appellant begins by arguing the military judge's finding of fact that Maj MP's relationship with Maj RW was "purely professional" was clearly erroneous in light of Maj MP's description of the relationship, and we should therefore grant the military judge's analysis no deference. Appellant further points to Maj MP's high opinion of Maj RW—a key Government witness—and Maj MP's ambiguous response to the military judge's question about how he would evaluate the testimony of the witnesses he personally knew. Because of Maj MP's positive opinion of Maj RW, Appellant contends he was "put in the untenable position of arguing that Maj RW's actions were inappropriate, and his judgment was flawed, to a fact finder who had a preconceived and openly expressed opinion that Maj RW was an 'incredible' person and who directly and personally relied on Maj RW's judgment."

The Government maintains Maj MP's relationship with Maj RW was simply professional based on Maj MP's statement that he would "classify [the relationship] as professional" in response to the military judge's question: "Would you characterize your relationship with [Maj RW] as strictly professional, personal or both?" The Government further argues that Maj MP's relationship with Maj RW was not per se disqualifying and that we should defer to the military judge's decision to deny the Defense's challenge.

The Government is correct that a panel member's professional relationship with a witness does not automatically preclude that member's service on a court-martial. *See Ai*, 49 M.J. at 5 (noting "a routine official or professional relationship between a member and a witness in a court-martial does not *per se* establish disqualifying implied bias" (citation omitted)). However, the military judge's conclusion that Maj MP and Maj RW had "purely a professional relationship" cannot be squared with Maj MP's explanation that the general nature of their interactions was "personal advice," covering such matters as "'toys' as in like cars . . . vehicles, stock market, how he's doing in the city." When asked to elaborate, Maj MP obliquely referred to trying "to learn a little bit about how [Maj RW was] making his ends meet." Although Maj RW had been "one of [Maj MP's] troops" in the past, the two apparently were not working together by the time of Appellant's court-martial, when they were interacting "probably about three to four times a month."

In general, military cases finding a non-disqualifying professional relationship between a member and a witness involve the member and witness in question knowing each other by virtue of their respective duties or having worked together at some point in the past. *See, e.g., United States v. Warden*, 51 M.J.

78, 82 (C.A.A.F. 1999) (an enlisted witness had been the personal secretary to a senior officer member during a prior assignment); *Ai*, 49 M.J. at 2 (three years prior to the trial, an enlisted witness had worked for an officer member for approximately a year; their interactions were "*strictly on duty, official-type dealings*;" and the two had not seen each other since); *United States v. Napoleon*, 46 M.J. 279, 282 (C.A.A.F. 1997) (a senior officer member knew a special agent witness professionally but the two did not socialize with each other).[14] In *United States v. Velez*, the United States Court of Appeals for the Armed Forces (CAAF) considered the case of a junior officer member who "work[ed] for" a Government rebuttal witness at the time of the court-martial, whom the member said he trusted. 48 M.J. 220, 225 (C.A.A.F. 1998). In that case, trial defense counsel did not challenge the member and the CAAF found the military judge did not err in not *sua sponte* dismissing the member, referring to case law pertaining to official acquaintances. *Id*. The outcome was different, however, when an officer member had a "significant relationship of trust" with the victim-witness based upon the fact the victim-witness's official duties included packing the member's parachute. *United States v. Leonard*, 63 M.J. 398, 403 (C.A.A.F. 2006). There, the CAAF concluded that although the relationship was entirely professional and duty-related, the member's inclusion on the panel "undermine[d] the appearance of fairness in the military justice system and, therefore, the military judge erred in failing to follow the liberal grant mandate." *Id*.

Maj MP's relationship with Maj RW is different in numerous respects from those which the CAAF has found to be non-disqualifying. First, Maj MP and Maj RW were peers, so there was no customary or military hierarchal limits on their relationship. Second, while the two had worked together at one point in the past, their relationship continued up to Appellant's court-martial and consisted of approximately weekly meetings unrelated to their official duties. Third, their conversations were not duty related, but rather focused on shared personal interests. Fourth, the two had more than a just passing relationship, as evidenced by the fact Maj MP said they spent 45 minutes talking about "how his life is going, how my life is going" three days before the trial. Fifth, Maj MP alluded to the fact—as trial defense counsel more precisely explained to the military judge—that he sought financial advice from Maj RW, a topic generally associated with a degree of trust and confidence. We also note Maj MP was less than forthcoming about the nature of his relationship with Maj RW, couching

---

[14] The member also had some "limited and general" knowledge of the charged offense. The CAAF found the question "a closer call," but concluded the denial of the challenge of the member was not error, in part due to the fact the special agent's testimony was limited to a description of the crime scene and a search, and that the agent's credibility was not contested. *Napoleon*, 46 M.J. at 283.

his comments in cryptic terms at times and being unnecessarily vague at others.

Compounding matters is that Maj MP did not proffer a general or measured opinion of Maj RW; instead, Maj MP said he had a "high opinion" of Maj RW and found him to be "incredible." Although the military judge correctly noted Maj MP also had "a high opinion" of Appellant, whom he thought "was exceptional," as well as Capt SS, whom he described as a "well-deserved troop," it is unclear how having positive opinions of Appellant and a defense-aligned witness somehow offsets or balances out an affinity for a Government witness. The military judge cited no authority for the proposition, and the Government has identified none in its response to this appeal. We are similarly unaware of any legal basis for such an assertion and, moreover, find the proposition illogical and unworkable. Appellant was entitled to impartial members, and the solution to a member having strong feelings about one witness would not seem to be ensuring the member had strong feelings about other witnesses as well.

When selecting members to serve on a court-martial, convening authorities are directed to detail members who are, in the convening authority's opinion, "best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(e)(2), UCMJ, 10 U.S.C. § 825(e)(2). Prior to the assembly of a court-martial, a convening authority may change the members without showing cause. R.C.M. 505(c)(1)(A). Thus, a convening authority has near unfettered authority to hand-pick the members who will sit on a particular court-martial, while an accused is limited to challenges for cause and a single peremptory challenge. As a result, military judges are bound by the liberal grant mandate, which is a "a response to the unique nature of the military justice system 'because in courts-martial peremptory challenges are much more limited than in most civilian courts and because the manner of appointment of court-martial members presents perils that are not encountered elsewhere.'" *James*, 61 M.J. at 139 (quoting *United States v. Smart*, 21 M.J. 15, 19 (C.M.A. 1985) (additional citation omitted)).

When a case is close, "military judges are enjoined to liberally grant challenges for cause." *Clay*, 64 M.J. at 277. As our superior court has explained, military judges are "mandated to err on the side of granting a challenge. This is what is meant by the liberal grant mandate." *Peters*, 74 M.J. at 34. We conclude this is such a close case, and the military judge therefore abused his discretion in denying the Defense's challenge of Maj MP.

The military justice system asked a great deal of Maj MP—namely, to set aside his high opinion of a key Government witness with whom he had regular conversations about personal and unofficial matters, a Government witness who was a paramour of the victim in the case. Even if Maj MP had the willingness and ability to do so, we are unconvinced that the public would conclude

16

Appellant's panel was fair and impartial. Instead, a member of the public would likely see Maj MP as being pressured by both conscious and unconscious biases, if not being called upon to conclusively decide where his loyalties lay as he listened to testimony and later deliberated. It is not a far reach to conclude that a not-guilty verdict would have sent the message that at least three people on the panel—of which Maj MP was a member—rejected either or both the testimony of Maj RW and Ms. CC, with whom Maj RW was intimately involved. Thus, a member of the public could rightly question whether Maj MP was influenced by the desire to maintain his relationship with Maj RW and not return a verdict suggesting either Maj RW or Ms. CC had told less than the truth on the stand.

Unlike the military judge, we conclude Maj MP's relationships with and opinions of other potential participants in the case exacerbates, rather than mitigates, matters. Appellant deserved a court-martial panel of members whose minds were unclouded by concerns of friendships and alliances. While we do not take issue with the military judge's findings as to actual bias, we conclude the risk is too high that the public would perceive Appellant "received something less than a court of fair, impartial members." *Woods*, 74 M.J. at 243–44. The challenge against Maj MP called for the exercise of the liberal grant mandate; the military judge's contrary determination was error.[15]

### 2. Lt Col KB

We reach the same conclusion with respect to Lt Col KB, although we find the call to be somewhat closer.

Appellant asserts Lt Col KB demonstrated implied bias both because of his sister's abuse and the fact he rented a room in Appellant's house. Appellant further contends that even if the military judge did not err on those grounds individually, the totality of the circumstances—that is, both of those grounds taken together—warranted Lt Col KB's excusal. Another facet of Appellant's allegation of error is his argument that the military judge should have *sua*

---

[15] Aggravating the potential perception of unfairness in this case is that the military judge stopped granting the Defense's challenges once the panel was reduced to ten members. Had he granted any further challenges, and had both parties exercised their peremptory challenges, the court-martial would have had an insufficient number of members to proceed. Notably, the Defense did not identify all its challenges up front; instead, the Defense raised them one at a time, only proceeding to the next after receiving a ruling on the stated challenge. Although nothing in the record demonstrates the military judge was influenced by concerns about possible delay of the court-martial, an observer could readily conclude this was so, based upon the sequence of the challenges and their denials.

*sponte* recalled Lt Col KB for additional individual voir dire to determine what Lt Col KB remembered about Appellant's house.

The Government responds that Lt Col KB's knowledge of his sister's abuse was minimal and did not have any meaningful impact on Lt Col KB. With respect to the room rental, the Government characterizes this as Lt Col KB possessing, at most, "innocuous prior knowledge" of facts related to Appellant's case. The Government agrees the military judge was required to assess Lt Col KB's fitness to serve as a panel member based on the totality of the circumstances, but points to the military judge's statement that he was denying the challenge "on those two bases" as evidence that he did, in fact, consider the totality of the circumstances. Finally, the Government also takes the position that it was trial defense counsel's obligation—not the military judge's—to develop the facts necessary to support their challenge against Lt Col KB.

We note that at the outset of Appellant's court-martial, the military judge instructed the members, "You must also not listen to or read any accounts of the case or visit the scene of any incident alleged in the specifications or mentioned during the trial." Such an admonition exists to deter members from supplementing the evidence they hear at trial with information they obtain from sources outside the courtroom. Here, we are not faced with a member who visited the scene of an alleged incident mid-trial, but rather one who had lived at the scene for a week. The outcome is the same, however: the member possessed information relevant to the case at hand which he had learned by means other than in-court presentation. Neither the Government nor Appellant have cited to cases featuring a similar set of circumstances; Appellant—not unreasonably—argues the dearth of appellate analysis of such a situation is probably due to the unlikelihood of similarly situated members surviving causal challenges. Like the parties, we have not identified cases involving a fact pattern akin to the one presented here.

In denying the challenge against Lt Col KB, the military judge cited *Rockwood*, in which the CAAF explained that all five of the members who sat in that court-martial "were challenged on a wide range of bases, including their various degrees of contact with prospective witnesses and other court members, [and] their knowledge of conditions on the ground in Haiti as a result of having been there." 52 M.J. at 105. The CAAF observed that members are not per se disqualified by virtue of having "innocuous prior knowledge of the facts of a case" or "a 'professional relationship' with government witnesses." *Id.* at 106 (first quoting *United States v. Lake*, 36 M.J. 317, 324 (C.M.A. 1993) and then quoting *United States v. Rome*, 47 M.J. 467, 469 (C.A.A.F. 1998)). While the CAAF in *Rockwood* did not explicitly analyze these issues, it stated that the Court of Criminal Appeals had "fully and satisfactorily treated" the matter.

*Id*. at 105. That lower court opinion, however, provides scant detail relevant to Appellant's case.[16]

It is undisputed Lt Col KB had a greater connection to the house where the charged offenses took place than the other members. As the military judge noted, however, neither party elicited detail from Lt Col KB as to what he recalled about the house, its layout, or the furnishings inside it. Appellant argues it was incumbent upon the military judge to *sua sponte* recall Lt Col KB for additional questioning once these deficiencies were raised, citing *United States v. Richardson*. 61 M.J. 113, 119 (C.A.A.F. 2005). Appellant's reliance on this case is misplaced, as it involved a military judge denying *a defense request* to re-open questioning of a particular member. Here, Appellant had the burden of establishing the basis for his challenge, not the military judge. R.C.M. 912(f)(3); *United States v. Wiesen*, 57 M.J. 48, 49 (C.A.A.F. 2002) (per curiam). The Defense never requested Lt Col KB be called back for any additional questioning. As our sister court has explained, it is up to the parties to obtain the information from the members to support their respective positions. *United States v. Mayo*, ARMY 20140901, 2017 CCA LEXIS 239, at *7–8 (A. Ct. Crim. App. 7 Apr. 2017) (unpub. op.) ("As is often the case, a military judge during voir dire knows little about the case, the evidence, or the parties' theories at trial, which makes a judge poorly positioned to determine whether any one issue is important to the case.").

Nonetheless, we conclude Appellant did adequately raise the specter that Lt Col KB's presence on the panel would lead members of the public to perceive that Appellant received less than a fair trial. Even the most perfunctory of review of the charge sheet in this case reveals allegations of a series of assaults by Appellant upon Ms. CC on a particular day. These assaults all occurred in Appellant's house, where Lt Col KB rented a room. In an assault case, it would be unsurprising that a focus of the evidence includes detail about the physical environment in which the assault occurred, as the parties are likely to debate the feasibility of the opposing party's narrative vis-à-vis physical obstacles and

---

[16] The Court of Criminal Appeals' opinion notes that one member had been told there was an ongoing investigation, but no other details about the case. *United States v. Rockwood*, 48 M.J. 501, 510 n.21 (A. Ct. Crim. App. 1998), *aff'd*, 52 M.J. 98 (C.A.A.F. 1999). Another member had witnessed Haitian police violently engaging civilians at a port facility. *Id*. at 510 n.22 (the appellant's court-martial stemmed from allegations he had unilaterally decided to inspect a Haitian prison after hearing about the poor conditions there). A third member had attended group Bible study discussions with one Government witness on approximately six occasions. *Id*. at 511 n.24. The court also indicated some of the members were aware of pretrial publicity regarding the case, but the court found the publicity had largely been generated by the appellant and portrayed him in a positive light. *Id*. at 512 n.26.

other facets of the site. In this particular case, as the Defense explained to the military judge, Appellant was accused of carrying out a multi-staged assault that traveled through the house, and the parties disagreed about what caused the "barricade" to fall. Specifically, they disputed whether it fell because Appellant pushed Ms. CC into it or because Ms. CC grabbed it and pulled it down. Having stayed in the house for a week, it would seem natural that Lt Col KB would recall certain particulars about the layout of the house, especially as the case progressed and his memory was refreshed. After all, he did not remember Appellant at first, but once his memory was refreshed, he recalled renting the room, talking with Appellant several times, and that there was a wife or girlfriend in the house, along with two children.

Although Lt Col KB did not interact with Ms. CC when he was staying at Appellant's house, Lt Col KB knew there was a woman living in the house while he was there. Likely as soon as the Government began its opening statement, Lt Col KB certainly would become aware that he had stayed in the house along with the victim and her two children. Moreover, Lt Col KB would understand that he had rented the room from and stayed in the house owned by Appellant, who was on trial for assaulting Ms. CC. We can only speculate as to what Lt Col KB made of these realizations, but it seems entirely plausible that he began searching his memory trying to recall if there were any clues of an abusive relationship or whether Appellant seemed like the kind of person who would assault his girlfriend. We believe this is the case not because Lt Col KB intentionally sought to supplement the evidence with his own knowledge, but simply because it is human nature to seek available information in resolving disputed matters, especially when that information arises from personal experience or observation.

As the case progressed, the layout of the house not unexpectedly became an issue, as one of the members even asked the court to provide a schematic of the house. It would seem natural for a member in Lt Col KB's position to be trying to recall what he remembered of the house and using that to form his own understanding of the evidence, if not to guide deliberations on the point. In the end, Lt Col KB had been involved with a business dealing with Appellant, interacted with Appellant as part of that dealing, resided in Appellant's home for a week, and was in the immediate proximity of the victim in the case while doing so. If military judges routinely prohibit members from visiting crime scenes, it is difficult to understand why the military judge in this case would seat a member who had already spent a not-insignificant amount of time at the scene. Notably, the military judge initially raised concerns about Lt Col KB's rental of the property, saying he was having "trouble with this particular individual," a reticence highlighting the risk that members of the public could reasonably have the same concerns about Lt Col KB's service on the panel.

The military judge found Lt Col KB to be both honest and credible in answering the questions put to him. The military judge's appraisal of Lt Col KB's forthrightness and fitness to serve on the panel "warrants great deference on the issue of actual bias, [but] it is not dispositive on the issue of implied bias." *United States v. Daulton*, 45 M.J. 212, 218 (C.A.A.F. 1996). We conclude having a member who has lived in Appellant's house—the very site of the charged offenses—alongside the victim and her children in a case in which the physical layout of the house was expected to be an issue was "asking too much of both him and the system." *United States v. Dale*, 42 M.J. 384, 386 (C.A.A.F. 1995) (quoting *United States v. Dale*, 39 M.J. 503, 508 (A.F.C.M.R. 1993) (Pearson, J., dissenting)). Therefore, the military judge clearly abused his discretion in denying the Defense's challenge of Lt Col KB.[17]

## III. CONCLUSION

The findings are **SET ASIDE**. The sentence is **SET ASIDE**. A rehearing is authorized. Article 66(d), UCMJ, 10 U.S.C. § 866(d). The record of trial is returned to The Judge Advocate General. Article 66(f), UCMJ, 10 U.S.C. § 866(f). Thereafter, Article 66(b), UCMJ, 10 U.S.C. § 866(b), will apply.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[17] The fact Lt Col KB's sister had been the victim of domestic abuse leading to her divorce—abuse which led Lt Col KB to both feel bad for his sister and to approve of the divorce—contributes to the totality of the circumstances warranting Lt Col KB's removal.